**2012-1336, -1354**

# United States Court of Appeals
# for the Federal Circuit

BENNETT MARINE, INC.,

*Plaintiff-Cross Appellant,*

*v.*

LENCO MARINE, INC. and RICHARD DEVITO, JR.,

*Defendants-Appellants,*

*and*

RINKER BOAT COMPANY and KIM SLOCUM,

*Defendants.*

*Appeals from the United States District Court for the Southern District of Florida in case no. 04-CV-60326, Judge Kenneth A. Marra.*

## APPELLANT'S INITIAL BRIEF

| | | |
|---|---|---|
| Eric C. Christu | Terence J. Linn | Barry Haley, Esq. |
| FL Bar No. 434647 | linn@glbf.com | blh@mhdpatents.com |
| Echristu@shutts.com | Karl T. Ondersma | Malin, Haley DiMaggio, |
| Danet Rodriguez Figg | Ondersma@glbf.com | Bowen & Lhota P.A. |
| Shutts & Bowen, LLP | Gardner, Linn, Burkhart | 1936 South Andrews Ave. |
| DFigg@shutts.com | & Flory, LLP | Ft. Lauderdale, FL 33316 |
| 525 Okeechobee Blvd | 2851 Charlevoix Drive SE | 954-763-3303(ph) |
| Suite 1100 | Suite 207 | 954-522-6507(fax) |
| West Palm Beach, FL 33401 | Grand Rapids, MI 49546 | |
| 561-650-8556(ph) | 616-975-5500(ph) | |
| 561-671-5900(fax) | 616-975-5505(fax) | |

*Attorneys for Appellants/Cross-Appellees*

September 17, 2012

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellants/Cross-Appellees, certifies the following:

1.      The full name of every party represented by me is: LENCO MARINE, INC. and RICHARD DEVITO, JR.

2.      The name of the real party in interest represented by me is: LENCO MARINE, INC. and RICHARD DEVITO, JR.

3.      There is no parent corporation nor any publicly held corporation that owns 10 percent or more of the stock of the party represented by me.

4.      The names of all law firms whose partners or associates appeared for the party in the District Court or are expected to appear in this Court are:

Shutts & Bowen LLP:  Eric C. Christu, Danet Rodriguez Figg
Malin, Haley, DiMaggio, Bowen & Lhota, P.A.:  Barry Haley
Gardner, Linn, Burkhart & Flory, LLP:  Terence J. Linn, Karl T. Ondersma
Ruden, McClosky, Smith, Shuster & Russell, PA:  Matthew S. Nelles


Dated: September 17, 2012            /s/ Eric C. Christu
                                     Eric C. Christu
                                     FL Bar No. 434647
                                     Shutts & Bowen, LLP
                                     525 Okeechobee Boulevard
                                     Suite 1100
                                     West Palm Beach, FL 33401
                                     561-650-8556(ph)/561-671-5900(fax)
                                     Echristu@shutts.com

i

# **TABLE OF CONTENTS**

*Page*

CERTIFICATE OF INTEREST ...............................................................................i

TABLE OF AUTHORITIES ..................................................................................v

I.    STATEMENT OF RELATED CASES .........................................................ix

II.   JURISDICTIONAL STATEMENT...............................................................1

III.  STATEMENT OF THE ISSUES....................................................................2

IV.   STATEMENT OF THE CASE .......................................................................3

V.    STATEMENT OF THE FACTS ......................................................................6

     A. The '780 Patent..........................................................................................6

          1.  Automatic Tab Retractor Circuit 42 .......................................................8

          2.  Inventor Testimony ...............................................................................10

     B.  Asserted Claims 1 and 9.........................................................................12

     C.  Prosecution Amendment to Avoid Takeuchi...........................................13

     D.  Lenco's Products ....................................................................................14

     E.  The Settlement Agreement......................................................................18

VI.   SUMMARY OF THE ARGUMENT .............................................................22

VII.  ARGUMENT ...............................................................................................24

     A. The District Court's Claim Construction is Incorrect ..............................24

          1.  The District Court Expanded the Scope of the Claims..........................24

          2.  The District Court's Claim Constructions.............................................26

               a.  Claim 1 - Limitation 2 (Claim 9 – Limitation 5)..............................26

ii

      b.  Claim 1 - Limitation 4 (Claim 9 – Limitation 4)..............................28

      c.  Claim 1 - Limitation 5 (Claim 9 – Limitation 6).............................32

         i. The Function Was Misidentified ...................................................33

         ii. Corresponding Structure Requires Hydraulic Components.........33

         iii. Corresponding Structure Requires Specific Components of
           Circuit 42 ....................................................................................34

B. Lenco's Products Do Not Infringe the '780 Patent......................................36

   1.  Installation of Lenco's Products did not Literally Infringe...................37

      a.  Lenco's Position-Counting Circuit is Substantially Different
          From the Patent's Inhibiting-Timing Circuit ...................................38

      b.  Lenco's RPM based re-designed version is substantially
          different................................................................................................40

      c.  Lenco's electrical implementation is substantially different
          from the patented hydraulics ...........................................................41

      d.  No evidence that Lenco's original systems were wired to self-
          retract based on removal of engine power.......................................43

         i.  Boat Engine Key Switches .............................................................44

         ii. Bennett's Investigations .................................................................44

   2.  Installation of Lenco's Products did not Indirectly Infringe.................45

C. DeVito and Lenco Did Not Induce Infringement .......................................47

D. No Willful Infringement As a Matter of Law...............................................51

   1.  Lenco Relied on Objectively Meritorious Defenses and There
      Was No Determination of Objective Recklessness ...............................51

   2.  A Determination of Willfulness Was Not Supported By the
      Record .................................................................................................54

   3.  Lenco Relied On Evidence Of An On Sale/Printed Publication ..........56

E.  Lenco Did Not Breach The Settlement Agreement ....................................58

F.  The '780 Patent was Invalid .......................................................................61

  1.  Anticipation by Newman .......................................................................61

  2.  Newman Renders The Claims Obvious...................................................64

    a.  Level of Ordinary Skill in the Art ....................................................65

    b.  Other Prior Art in Combination with Newman ...............................65

VIII. CONCLUSION AND STATEMENT OF RELIEF SOUGHT .....................67

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*A.R. Holland, Inc. v. Wendco Corp.*,
    884 So.2d 1006, 1008 (Fla.1st DCA 2004)....................................................58

*ACS Hospital Systems, Inc. v. Montefiore Hospital*,
    732 F.2d 1572, 221 USPQ 929 (Fed. Cir. 1984)..........................................37

*Altiris Inc. v. Symantec Crop.*,
    318 F.3d 1363, 65 USPQ2d 1865 (Fed.Cir. 2003)........................................26

*Alza Corp. v. Mylan Laboratories, Inc.*,
    464 F.3d 1286, 80 USPQ2d 1001 (Fed.Cir. 2006)........................................61

*Atmel Corp. v. Information Storage Devices, Inc.*,
    198 F.3d 1374, 53 USPQ2d 1225 (Fed.Cir. 1999)........................................31

*Atofina v. Great Lakes Chemical Corp.*,
    441 F.3d 991, 78 USPQ2d 1417 (Fed.Cir. 2006)..........................................61

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*,
    682 F.3d 1003, 103 USPQ2d 1088 (Fed.Cir. 2012).....................................51

*Biomedino, LLC v. Waters Technologies Corp.*,
    490 F.3d 946, 83 USPQ2d 1118 (Fed.Cir. 2007)..........................................30

*Boca Concepts, Inc. v. Metal Shield Corp.*,
    78 So.3d 567 (Fla.4th DCA 2011)................................................................59

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    296 F.3d 1106, 63 USPQ2d 1725 (Fed.Cir. 2005)..................... 24, 26, 29, 33

*Chiuminatta Concrete Concepts v. Cardinal Industries, Inc.*,
    145 F.3d 1303, 46 USPQ2d 1752 (Fed. Cir. 1998)............................... 37, 46

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314, 90 USPQ2d 1865 (Fed.Cir. 2009)................................. 53, 54

*Digital Biometrics, Inc. v. Identix, Inc.*,
   149 F.3d 1335, 47 USPQ2d 1418 (Fed. Cir. 1998)......................................41

*DSU Med. Corp. v. JMS Co., Ltd.,*
   471 F.3d 1293, 81 USPQ2d 1238 (Fed. Cir. 2006)......................................47

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S.Ct. 2060 (2011)...................................................................................51

*Graham v. John Deere Co.*,
   383 U.S. 1, 148 USPQ 459 (1966) ...............................................................64

*IMS Technology, Inc. v. Haas Automation, Inc.*,
   206 F.3d 1422, 54 USPQ2d 1129 (Fed. Cir. 2000)............................... 37, 38

*In re DBC*,
   545 F.3d 1373, 89 USPQ2d 1123 (Fed.Cir 2008)........................................64

*In re Donaldson Co.*,
   16 F.3d 1189, 29 USPQ2d 1845 (Fed. Cir. 1994).......................................31

*In re Hall*,
   781 F.2d 897, 228 USPQ 453 (Fed. Cir. 1986)............................................58

*In re Theis*,
   610 F.2d 786, 204 USPQ 188 (CCPA 1979)................................................58

*Ishida Co., Ltd. v. Taylor*,
   221 F.3d 1310, 55 USPQ2d 1449 (Fed. Cir. 2000)......................................31

*J&M Corp. v. Harley-Davidson*,
   269 F.3d 1360, 60 USPQ2d 1725 (Fed.Cir. 2001)......................................24

*J.A. LaPorte, Inc. v. Norfolk Dredging Co.*,
   787 F.2d 1577, 229 USPQ 435 (Fed.Cir.1986)............................................58

*KSR Int'l v. Teleflex Inc.*,
   550 U.S. 398, 82 USPQ2d 1385 (2007) .......................................................64

*Laitram Corp. v. Rexnord Inc.*,
   939 F.2d 1533, 19 USPQ2d 1367 (Fed. Cir. 1991)......................................32

*Lampi Corp. v. American Power Prods. Inc.*,
   228 F.3d 1365, 56 USPQ2d 1445 (Fed. Cir. 2000)......................................34

*MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369, 76 USPQ2d 1276 (Fed.Cir. 2005)......................................60

*Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*,
   194 F.3d 1250, 52 USPQ2d 1258 (Fed. Cir. 1999)......................................33

*Odetics, Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999) ...................................... 25, 34, 38

*Phillips v. AWH Corp.*,
   415 F.3d 1303, 75 USPQ2d 1321 (Fed. Cir. 2005)......................................41

*Ralston Purina Co. v. Far-Mar-Co., Inc.*,
   772 F.2d 1570, 227 USPQ 177 (Fed.Cir. 1985)..........................................61

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816, 23 USPQ2d 1426 (Fed.Cir. 1992)........................................54

Ryan , LLC v Evans,
   2012 WL 1532492 (M.D. Fla. March 20, 2012 ..........................................58

*Ryco, Inc. v. Ag-Bag Corp.*,
   857 F.2d 1418, 8 USPQ2d 1323 (Fed. Cir. 1988)......................................41

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
   620 F.3d 1305 (Fed. Cir. 2010) ........................................... 51, 54

*SSIH Equipment S.A. v. U.S. I.T.C.*,
   718 F.2d 365, 218 USPQ 678 (Fed.Cir. 1983)............................................62

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
   308 F.3d 1193, 64 USPQ2d 1812 (Fed.Cir. 2002)......................................35

*Upsher-Smith Labs, Inc. v. Paulab, LLC*,
   412 F.3d 1319, 75 USPQ2d 1213 (Fed.Cir. 2005)......................................63

*Valmont Industries, Inc. v. Beinke Manufacturing Co. Inc.*,
   983 F.2d 1039, 25 USPQ2d 1451 (Fed. Cir. 1993)......................................37

*WMS Gaming, Inc. v. International Game Technology*,
   184 F.3d 1339, 51 USPQ2d 1385 (Fed. Cir. 1999) ....................................35

**Statutes and Rules**

28 U.S.C. § 1295(a)(1) .............................................................................1

28 U.S.C. § 1338(a) .................................................................................1

35 U.S.C. § 102 ............................................................................... 2, 3, 61

35 U.S.C. § 103 ....................................................................................2, 3

35 U.S.C. §103(a) .................................................................................64

35 U.S.C. §112 .....................................................................................25

35 U.S.C. §112(2) .................................................................................31

35 U.S.C. §112(6) ........................................................................... *passim*

Fed. R. App. P. 4(a)(1)(A) ......................................................................1

## I.    <u>STATEMENT OF RELATED CASES</u>

There has been no appeal of this civil action to this or any other appellate court under the same or similar caption.  The patent at issue, U.S. Patent No. 5,113,780, is not the subject of any other appeal pending before this Court, nor of any other proceeding in any other court.  There is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in this pending appeal.

## II.    <u>JURISDICTIONAL STATEMENT</u>

Subject matter jurisdiction in the District Court was based upon 28 U.S.C. § 1338(a).    This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).    This appeal, taken as of right from a Second Amended Final Judgment entered March 2, 2012, was timely filed pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A) on March 30, 2012.

### III.    <u>STATEMENT OF THE ISSUES</u>

1.    Whether the lower court erred in its construction of claims 1 and 9, the only claims asserted at trial, of U.S. Patent No.  5,113,780 (the "'780 patent").

2.    Whether the lower court erred in finding that the trim tab systems of LENCO MARINE, INC. ("Lenco") infringed claims 1 and 9: (a) when installed directly to a boat engine's ignition switch, and (b) when installed to a boat engine's tachometer.

3.    Whether the lower court erred in finding Lenco and RICHARD DEVITO, JR. ("DeVito") induced infringement of the '780 patent.

4.    Whether the lower court erred in finding Lenco breached the Settlement Agreement.

5.    Whether the lower court erred in finding Lenco and DeVito willfully infringed, or willfully induced infringement of the '780 patent.

6.    Whether the lower court erred in concluding the claims of the '780 patent were not invalid under 35 USC §§102 and/or 103 in view of the prior art.

# IV.   <u>STATEMENT OF THE CASE</u>

This is an appeal of the Second Amended Final Judgment (the "Judgment") entered below on March 2, 2012.  A59.  The Judgment was based upon the lower court's Findings of Fact and Conclusions of Law (the "Findings") dated September 29, 2011, which was entered more than two and one-half years after the two-week trial below which ended on February 9, 2009.  A1, A100.

In its Findings, the lower court  reaffirmed its prior Opinion and Order dated May 30, 2007 (the "Claim Construction Order") wherein it construed claims 1 and 9 of the '780 patent.  A28.  Based on that construction, the lower court found that Lenco's trim tab systems infringed claims 1 and 9 of the '780 patent (a) when installed directly to a boat engine's ignition switch, and (b) when installed to a boat engine's tachometer.  A32-36.

The lower court rejected Lenco and DeVito's argument that the claims of the '780 patent were invalid under 35 USC §§102 and/or 103 in view of Bennett's publication and/or sale activities prior to August 30, 1989, and/or in view of the prior art.  A41-44.

The lower court found that Lenco and DeVito had willfully induced infringement of the '780 patent by Rinker and others.  A36-52, A57.  The lower court was careful, however, to specify that Lenco was *not* liable for any infringement *prior to* the execution of the February 25, 2003 Settlement

Agreement between Lenco and Bennett.  A2-3.   Lenco was only liable for *post*-Settlement Agreement acts of inducing infringement by Rinker.  *Id.*

Below, Bennett requested injunctive relief and money damages.  The lower court rejected Bennett's request for an injunction finding no irreparable harm.  The lower court concluded that money damages alone were sufficient to make Bennett whole.  A54-55.  The lower court further concluded that Bennett was not entitled to injunctive relief since the sales it lost to Lenco were due to Lenco's product "being a superior product," not because of the automatic retraction feature covered by the '780 patent.  A54-55.

In determining the amount of damages to award Bennett for inducement to infringe, the lower court rejected lost profits as the proper measure.  A53.  Lost profits would be a windfall given that Lenco's customers preferred Lenco's product over Bennett's for reasons other than the retraction feature covered by the '780 patent.   A15-16, 55.   Instead, the lower court awarded damages based on a reasonable royalty of $3.00 per unit and then doubled the total award based on its finding of "willfulness."[1] A53.  The lower court also awarded Bennett prejudgment interest from the date of trial to the date of the judgment. A53.

---

[1] The lower court's finding of "willfulness" impacts not only the amount of damages awarded but also Bennett's ability to recover attorneys' fees and costs. Indeed, Bennett has pending a Motion requesting attorneys' fees and non-taxable costs in the amount of $1,957,049.83, plus $65,941.63 in taxable costs.

Based on its finding of inducement, the lower court concluded that Lenco breached paragraph 10 of the Settlement Agreement between Lenco and Bennett, which prohibited Lenco from advising or counseling anyone to wire its retraction device in a manner other than as set forth in the Agreement.  A56.  Having found that Lenco breached, the lower court rejected Lenco's argument that paragraphs 12 and 13 of the Settlement Agreement should be enforced to bar Bennett's patent suit.  A52-53.  Despite finding a breach, the lower court did not award Bennett any additional damages concluding that "the damages for patent infringement … are the same damages suffered by Bennett for Lenco's breach of the contract."  A56.

Lastly, the lower court found that Bennett failed to prove its state law claims of common law Unfair Competition, Fraud, Fraudulent Misrepresentation and violation of Florida's Deceptive and Unfair Trade Practices Act.  A57.  Alternatively, the lower court found that, even had Bennett satisfied its burden of proving those claims, it would make no difference to the damages awarded since "Bennett's damages, if any, for these claims would be the same damages it suffered from the patent infringement and breach of contract."  *Id.*

## V.    STATEMENT OF THE FACTS

Bennett and Lenco are competitors in the sale of trim tab systems, and Rinker sells powerboats that utilize trim tab systems sold by Lenco.  A1-2.

DeVito is Lenco's President.  A2.  Blake Bennett is Bennett's President and a co-inventor on the '780 patent along with David Hagstrom ("Hagstrom").  A2-3.

## A.    The '780 Patent

The '780 patent discloses a control system for operation of boat mounted trim tabs that are moveable to adjust the boat's trim – and particularly to a control circuit employed with a hydraulic system that automatically returns the trim tabs to a fully retracted position when the engine is turned off.  The '780 patent figures are reproduced below, followed by the first paragraph of the Detailed Description:



FIG. 1 illustrates…a pair of trim tabs 12, 14 pivotally mounted by respective hinges 16, 18 on the stern 20 of a boat hull 22.  A pair of hydraulic actuators 24, 26 are respectively mounted on stern 20 and have actuator rods that extend to trim tabs 12, 14.  A fluid pump 28 is powered by an electrical motor 30 for supplying hydraulic fluid under pressure from a fluid source to actuators 24, 26 through respective solenoid-operated flow control valves 32, 34.  An ignition key switch

36 selectively connects the ignition control system 37 of the boat engine to a source of electrical power, such as battery 38. An operator switch 40 is coupled to battery 38 for selectively applying electrical control signals to motor 30 and valves 32, 34 for adjusting position of trim tabs 12, 14 independently of each other. To the extent thus far described, system 10 is of conventional construction, with the electrohydraulic trim tab control being disclosed in detail in above-noted U.S. Pat. No. 3,695,204.

A110, 2:34-51.

After noting the conventional construction, the Detailed Description states, "[i]n accordance with the present invention, an electronic control circuit 42 (FIGS. 1 and 2) is connected to motor 30 and valves 32, 34 for automatically retracting actuators 24, 26 and tabs 12, 14 upon removal of ignition power from engine ignition control 37." A110, 2:55-59. The Detailed Description is, thus, primarily directed toward the specific disclosure of circuit 42 – how it is constructed, operates and is connected with the hydraulic trim tab system. A110, 2:55–A111, 3:52.

The disclosure is limited to a hydraulic implementation, with circuit 42 specifically disclosed as being connected "to motor 30 and valves 32, 34" where pump motor 30 powers "fluid pump 28 . . . for supplying hydraulic fluid under pressure from a fluid source to actuators 24, 26 through respective solenoid-operated flow control valves 32, 34". A110, 2:40-44, 55-59. In particular, control circuit 42 operates the system for a ***predetermined time*** duration that is fixed by circuit components, including capacitor 48 and resistor 52. A111, 3:32-46, 58-60.

The only reference in the '780 patent to use of anything but a hydraulic system is found near the end of the Detailed Description, as follows:

It will be appreciated, of course, that the principles of the invention apply to electrical or pneumatic actuators of trim tabs, in addition to the preferred hydraulic implementation.

A111, 3:53-56.  No disclosure of an electrical or pneumatic system is provided, let alone an electronic circuit for use with actuators for such systems.

### 1.    Automatic Tab Retractor Circuit 42

The '780 patent described the operation of control circuit 42:

The electronic control circuit is coupled to the fluid drive and is responsive to removal of electrical ignition power from the engine for operating both actuators simultaneously for a predetermined time duration so as to move both trim tabs to the fully retracted positions upon removal of ignition power from the engine.

A110, 2:2-7; A108.

Control circuit 42 is described as including components for three sub-operations: (1) components that inhibit automatic retraction, (2) discharge timing components that establish the duration of automatic retraction, and (3) power applying relays that activate pump motor 30 and valves 32, 34 to move the trim tabs during retraction.

Circuit 42 must be prevented from operating when the boat is in normal use to prevent interference with manual positioning via switch 40.  The components that "inhibit" automatic retraction are highlighted in the following annotated

8

Figure A, and are coupled to the engine through ignition switch 36.  When switch 36 is closed to start the engine, power is applied to circuit 42 and delivered to amplifier 62 to prevent operation of amplifier 54, thereby inhibiting the timing components and preventing retraction.  A111, 3:15-26.  Accordingly, relays 68,70 are open as shown in Figure C below, so that power is not applied to pump motor 30 and valves 32,34.  This allows the boat operator to control the trim tabs.  A111, 3:15-26.



FIG. A    FIG. B

The discharge timing components enable operation of valves 32,34 and pump motor 30 for a pre-set period of time to automatically retract the trim tabs when the boat engine is turned off.  Those components are highlighted in the annotated Figure B above.  In addition to amplifier 54, the timing components include a capacitor 48 that stores a charge when switch 36 is closed, with the charge being limited by zener diode 50 and resistor 52.  A110, 2:63-65; A111, 3:15-19.  Finally, electronic relays 68 and 70 are coupled to pump motor 30 and valves 32, 34 that physically move the trim tabs.

9



FIG. C

The circuit components that inhibit automatic retraction are responsive to removal of electrical power from the engine. Upon removal of power, "[a]mplifier 62 no longer inhibits operation of amplifier 54" such that the discharge timing components enable automatic retraction for a "*predetermined time duration.*" A111, 3:27-47. When switch 36 is opened capacitor 48 discharges, closing relays 68,70 so battery 38 energizes pump motor 30 and valves 32,34 for automatic retraction. A111, 3:37-47. Once capacitor 48 is drained, relays 68,70 re-open to halt pump motor 30 and valves 32,34.

It is the discharge of power stored on capacitor 48 that enables retraction of the trim tabs, and the time *duration* that the pump motor and valves are operated is dictated by the values of capacitor 48 and resistor 52. A111, 3:33-37, 42-47.

## 2.    Inventor Testimony

Co-inventor David Hagstrom corroborated the outlined inhibiting, discharge timing and power applying relay component operation of control circuit 42, and the

10

importance of the associated components.    A4433-A4440; A5855-A5857;

A5863:13-23.

Mr. Hagstrom testified:

> The circuit was designed to activate relays for predetermined amount
> of time based on the application and removal of a signal.
> *    *    *
> The application of the ignition serves to charge a capacitor in the
> device and also to keep the device off when the ignition is applied.
> And when the ignition signal is removed, the device then uses that
> stored charge to activate the trim tab system for a period of time.

A5943:1-3; A5936:13-18.

Mr. Hagstrom confirmed the elements **necessary** for the timing feature

include diode 44, resistor 46, zener diode 50 and capacitor 48, and amplifier 62

somewhat in application on resistor 52.  If capacitor 48 were removed the circuit

would not operate.  A5857:20-24; A5858:4-21; A5869:2-19.

Mr. Hagstrom testified regarding elements **necessary** to enable the

"inhibiting" feature, power is needed at switch 36 to flow through diode 56, so

resistors 58,60 create a level to switch on amplifier 62 and amplifier 54 off.

A5865:6-10.  If amplifier 62 were removed the circuit would not inhibit operation,

and relays 68 and 70 are necessary to apply power to the pump motor and valves.

A5864; A5868:24-A5869:1.[2]

Circuit 42 thus is an "open-loop system" that does not know the position of

---

[2] The only component of Figure 2 Mr. Hagstrom did not reference as necessary to
operation was diode 72.

the trim tabs and will operate for the same length of time regardless of their position.  A5866:17-A5867:23.

**B.**    **Asserted Claims 1 and 9**

Only independent claims 1 and 9 were asserted at trial, and both were found to be infringed.  The court identified five "elements" of claim 1, all of which were identified as means-plus-function limitations:

| Claim 1 | A boat trim control system that comprises: |
|---|---|
| Limitation 1: | a boat having a hull and an engine for powering said boat; |
| *Limitation 2:* | means for selectively applying electrical power to said engine for powering the boat; |
| Limitation 3: | means movably mounted to said hull for trimming attitude of said boat as said hull is propelled through the water; |
| *Limitation 4:* | means carried by said hull and responsive to a boat operator for selectively adjusting position of said trimming means to maintain desired attitude under varying conditions, and |
| *Limitation 5:* | means coupled to said trimming means and to said engine, and responsive to removal of electrical power from said engine, for automatically moving said trimming means to a predetermined position with respect to said hull upon removal of power at said engine. |

Independent claim 9 is substantially similar to claim 1:

| Claim 9: | A boat trim control system that comprises |
|---|---|
| Limitation 1: | a boat having a hull with a stern and an engine, |
| Limitation 2: | at least one trim tab pivotally mounted to said hull at said stern, |
| Limitation 3: | an actuator extending between said hull and said tab for selectively moving said tab between said fully extended and retracted positions, |
| *Limitation 4:* | means including a drive responsive to an operator for selectively adjusting position of said trim tab to obtain a desired attitude of said hull, |
| *Limitation 5:* | means for selectively applying electrical ignition power to said engine for powering said boat, and |
| *Limitation 6:* | means coupled to said drive and responsive to removal of electrical power from said engine for operating said actuator for a predetermined time duration so as to move said trim tab to said fully retracted position upon removal of ignition power from said engine. |

Claim 1, limitations 4, 2 and 5, respectively, are substantially similar to claim 9, limitations, 4, 5 and 6, and represent the disputed claim limitations.

## C.  **Prosecution Amendment to Avoid Takeuchi**

During prosecution (A4784-A4791) of the application leading to the '780 patent, all claims were initially rejected based on U.S. Patent 4,762,079 to Takeuchi (A4544-A4550) disclosing the claimed structure "including a trim tab system which can be controlled by engine speed."  A4785.  Takeuchi discloses a system for automatically positioning a trim tab in response to, among other factors,

engine speed sensed by utilizing the ignition coil.  A4544:Abstract; A4549, 3:43-49.

In response, claim 1, limitation 2 ("means for selectively applying electrical power to said engine for powering the boat") was added and limitation 5 amended to specifically require that automatic moving of the trimming means was responsive to the newly added requirement of removal of power from the engine. A4788.  Applicants argued claim 1 was amended to distinguish Takeuchi and that claim 9 already included the amendments added to claim 1.  A4789-90.

Additionally, Takeuchi discloses an outboard motor, which the examiner initially cited as fully anticipating and implicitly found to satisfy the trimming limitations of claims 1 and 9.  A4785.  The inventors never argued in response that Takeuchi was inapplicable based on it disclosing an outboard motor system.

## D.    **Lenco's Products**

At issue are two versions of Lenco trim tab systems incorporating self-retraction – an original version that could be wired to a boat key switch, and a re-designed version wired to a tachometer where self-retraction occurs upon detecting that the RPM signal drops below a pre-set level.

Both systems include a control box having a complex electronic circuit that monitors the extension and retraction of the screw-driven actuators (shown following) to provide the operator a visual indicator of the up and down position of

14

the trim tabs via a series of indicator lights on the operator switch. Lenco's reason for self-retraction was to place the trim tabs into a known position in order to calibrate the indicator lights with the trim tab position at start-up.



A4783.

The designer of Lenco's system, David Martin, was hired to develop a circuit that would monitor the position of the actuator for the purpose of providing a visual indicator. A2489:21-A2490:9; A2493:9-A2494:11. The system was designed without knowledge of the '780 patent and self-retraction was not a design

goal.    A2533:12-19; A2504:19-21.    By monitoring actuator position, Lenco's circuit operates as a "closed-loop system."  A2534:6-23.

A Lenco operator switch has a pair of buttons that control the up and down position of a pair of trim tabs, each button controlling a separate trim tab.  A4246.  A series of lights to the outside of either button indicate the relative position of the trim tabs.  All of Lenco's systems are used with electrical screw-driven



actuators. A4783.  Lenco's systems also include a circuitry control box to which the actuator and switch are connected.  A6; A2497:6-A2499:4; A4240; A4244.  A cursory review of the Lenco control circuit illustrates its complexity.  A4381-4384.

Lenco's control circuit detects and counts pulses generated by rotation of the actuator motor which is linked by gears to a screw in order to extend or retract the actuator in response to the operator depressing the switch buttons.  The pulse count is stored in a temporary memory, i.e. volatile memory, of the control circuit.  The indicator lights are progressively illuminated based on the pulse count, with the system working independently for the starboard and port trim tabs.    A2507:20-A2510:16; A2528:14-24.

The self-retraction feature of Lenco's systems moves the trim tabs to a fully retracted position by operating the actuators for the required number of pulses in

order to return the counter to zero. This occurs upon removal of power from a particular wire of the control box, with each actuator retracting independently based on the pulse count for that actuator. Self-retraction is utilized because the Lenco circuit does not include nonvolatile memory. The actuator must be placed into a known position before fully powering the control box down, otherwise the circuit would not know the position of the actuator once it was re-powered and the indicator lights would not be calibrated to the trim tab position. A2511:7-A2516:5.

Both Lenco's and Bennett's experts confirmed that the Lenco systems operate in this manner. A1910:25-A1911:24; A1965-A1969; A2764:2-9; A2781:13-A2783:2.

The Lenco systems are able to independently operate port and starboard actuators and include three categories of circuitry. One, H-bridge circuits drive the actuators. A4381; A2506:1-16; A2517:18-A2518:5. Two, pulse filters extract the current changes in the wires caused by rotation of the brushes in the actuator motors, thus generating pulses to be counted. A4382; A2506:14-A2507:5; A2518:6-14. Three, programmable logic devices (CPLDs) are configured with VHDL code for monitoring, storing, and displaying information corresponding to the position of the trim tabs. Each CPLD acts as a counter of the pulses from the pulse filters, and adds or subtracts one whenever it receives a pulse. A4383; A2508:2-16; A2520:6-17. The VHDL code controlling the programmable logic

17

devices is substantially identical for both versions of the systems, and was introduced and detailed at trial.  A2524-A2533; A4264-73.

The circuit and programming code of Lenco's re-designed tachometer signal based system is substantially similar to that of the original version.  The primary difference is the addition of another microprocessor to the circuit.  In both versions, depending upon where an "orange wire" of the control box is wired, self-retraction occurs either upon removal of a power signal from that wire or an RPM signal below a certain threshold.  A2520:18-A2522:4; A2524:6-20.

## E.    **The Settlement Agreement**

Bennett alleged that the original Lenco system infringed the '780 patent, which Lenco denied.  In February 2003, Lenco and Bennett entered into a Settlement Agreement to resolve this disputed claim. A3049.  Lenco complied with its obligations under the Settlement Agreement. A11. Lenco paid Bennett royalties totaling $25,970.00 to license 371 units Lenco warranted had been sold or distributed with instructions to wire the ATR through the ignition switch.  A10-11.  Lenco sent the letter attached as Exhibit C to the Settlement Agreement instructing customers to stop wiring the ATR through the ignition switch.  A11.

The only breach found was of Paragraph 10 of the Settlement Agreement, providing:

Lenco will not advise or counsel any sales representative, builder, dealer, retailer, discounter, mail order or catalog customer, prospective or actual, supplier, distributor, inquirer, prospect or potential customer, or representative to wire Lenco's retraction device in any manner other than as shown in "Appendix B," or as otherwise provided in paragraph 5, and furthermore will not state, represent or imply that its retraction device is "automatic" or "autotab," or that the retraction device operates in connection with or in response to terminating the electrical power to the engine powering the boat.

A3051-52.

Bennett had three live fact witnesses – Blake Bennett (A1308-A1496), Thomas McGow ("McGow") (A1515-A1765) and Steven Moyer ("Moyer") (A1785-A1842). None testified that they had ever heard DeVito, or anyone else from Lenco, counsel or advise anyone to ignore the wiring instructions in the Settlement Agreement. A1689:24-A1690:6; A1703:24-A1704:14; A1423:19-A1424:4. As to any trim tabs wired contrary to the Settlement Agreement, no witness knew when or where they were installed, who installed them or how many existed. A1651:3-A1652:15.

Lenco's customers made clear that neither DeVito nor anyone else at Lenco ever advised them to wire the retraction device to the ignition switch. (A5643:9-A5644:6; A5813:2-4; A5815:23-A5816:1; A5816:13-14). DeVito, individually and on behalf of Lenco, testified he never counseled or advised any Lenco customer to wire any Lenco retraction device contrary to the Settlement Agreement. A2167:6-19. DeVito testified "[w]e did not want any trouble … so our patent attorneys

wrote up just what to say that would be proper for the settlement agreement…so we had scripts, basically" that were kept "by the phones."  A2167:25-A2168:13.

Bennett routinely sent copies of the Settlement Agreement to Lenco's customers "as a marketing tool" (A1699:20-A1700:23), and accused Lenco and its customers of infringement.  A1691:22-A1692:15; A1694-A1698; A3841-A3842.

Bennett threatened Lenco's customers that Lenco might not honor their warranties if they installed any Lenco product contrary to the Settlement Agreement.  A1830:21-A1831:18.  Bennett did this as a "sales tactic."  *Id.*

In a form letter Bennett sent to Lenco's customers, Bennett stated, "[d]uring the 1990s, on three occasions, Bennett Marine was called upon to address trim tab manufacturers which we believed were infringing on this '780 patent … [i]n all three matters, Bennett's patent was upheld and the infringing activity discontinued."  A3858; A3868; A3885.  Bennett later admitted that <u>no</u> court ever "upheld" the '780 patent.  A1445:21-22; A1688:20-22.  Bennett had only brought suit under the '780 patent <u>once</u> before and even that resulted in a consent decree. A1445:8-14.

In the same form letter, Bennett accused Lenco of "covertly advising its customers how to wire its retractor device contrary to the instructions mandated by the settlement agreement."  A3858-59; A3868-69.  At trial, Bennett's witnesses admitted having <u>no</u> such knowledge: Blake Bennett denying any knowledge of

Lenco doing anything covertly (A1444:12-14); McGow denying ever hearing anyone from Lenco covertly advising customers not to follow wiring instructions in the Settlement Agreement.  A1689:24-A1690:6.

Lenco indemnified at least three of its customers against any claim of infringement by Bennett.  A13.

# VI.    SUMMARY OF THE ARGUMENT

Lenco provides trim tab systems that are materially different from the hydraulic actuator-based systems controlled by a timer circuit that runs for a set period of time, as disclosed and claimed in the '780 patent.  The Lenco systems employ position monitoring circuits that control electrically driven screw actuators to move the trim tabs.  The finding of infringement was in error resulting from the district court's erroneous claim construction.  That error arose principally from §112(6) limitations that were interpreted functionally to encompass any means for performing the identified functions.

The erroneous claim construction: (1) limited the "means for selectively applying electrical power to said engine…" to an engine on-off switch, and omitted the necessary ignition control system; (2) limited "means…responsive to a boat operator for selectively adjusting position of said trimming means…" to an operator control switch, battery, and actuators of any sort, and omitted the disclosed necessary hydraulic components; (3) limited "means …responsive to removal of electrical power from said engine, for automatically moving said trimming means…upon removal of power at said engine" to any form of control circuit as represented by a simple block in patent Figure 1.  That interpretation omitted the control circuit of Figure 2 that includes inhibiting circuit components which prevent the operator from being overridden, timer circuit components which enable movement for a preset duration, and power applying circuit components

22

along with hydraulic actuators, fluid, a pump and a motor, where the circuit is connected to the hydraulic pump motor and valves to actually move the trim tabs.

A conclusory statement in the patent that the *principles* of the invention apply to electrical actuators does not provide disclosure adequate for §112(6). Lenco's systems did not respond to these functions or include the necessary components or their equivalent. A revised system of Lenco emulated a prior art system Bennett distinguished during prosecution. Lenco's revised system tied into a tachometer to sense and activate below a threshold RPM, and does not infringe for yet additional reasons. Moreover, if the '780 patent is interpreted functionally to encompass any means, the claims are necessarily anticipated and rendered obvious by Newman Patent 4,872,857.

The finding of willfulness failed to make a determination of objective recklessness by Lenco in relying on its defenses. Those defenses were meritorious, and the court determined that customers chose Lenco's systems because they were ***superior products***, not due to automatic retraction. The record does not support a determination that Lenco or DeVito induced boat makers to wire systems contrary to Lenco's printed instructions or breached its Settlement Agreement with Bennett. Lenco also introduced substantial evidence on defenses not pursued on appeal due to their fact-intensive nature. Those defenses that an anticipating Bennett printed publication created an on sale bar were reasonably relied upon at trial.

23

# VII.   ARGUMENT

## A.   The District Court's Claim Construction is Incorrect

Claim interpretation is an issue of law, subject to *de novo* review.  *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113, 63 USPQ2d 1725 (Fed.Cir. 2005).

### 1.   The District Court Expanded the Scope of the Claims

As detailed below, the court was led to improperly expanded claim constructions by Bennett's legally incorrect means-plus-function interpretations.  A "means-plus-function limitation does not extend to all means for performing a certain function.  Rather, the scope of such claim language is ***sharply limited*** to the structure disclosed in the specification and its equivalents."  *J&M Corp. v. Harley-Davidson*, 269 F.3d 1360, 1367, 60 USPQ2d 1725 (Fed.Cir. 2001) (emphasis added).

Three errors permeate the claim construction.  One was interpretation of corresponding structure for a means-plus-function limitation to be the block shown for circuit 42 in the diagram of Figure 1, rather than any components of that circuit described in the specification and Figure 2.  ("[T]he overall structure identified by this Court in its interpretation…is the control circuit 42, fig. 1, not the control circuit depicted in fig.2.")  A33¶35.   The court ruled that specifics of the control circuit need not be considered: "Lenco's ATR need only include the structure of a

control circuit *as depicted in fig. 1* of the '780 Patent which performs the function

of … in order to directly infringe the '780 patent" (emphasis added).  A32¶33-

A33¶35.  This approach ignored the disclosed structure necessary to perform the

recited function.

A second was the erroneous incorporation of the infringement analysis'

second step, comparing construed claims with an accused device, into the claim

construction step.  The court erroneously quoted the second infringement step

analysis of *Odetics, Inc. v. Storage Tech.* as applying to its interpretation step:

> 20.    The Court interpreted the fifth element of Claim 1…as a means
> plus function terms [sic]…The structure is the control circuit 42, fig.
> 1, and equivalents thereof.

> 21.    The Court rejected Defendant's attempt to describe the control
> circuit structure by way of listing all the component parts.  As the
> Court stated in <u>Odetics, Inc. v. Storage Tech. Corp.</u>, 185 F.3d 1259,
> 1268 (Fed.Cir. 1999), a claim limitation written in means plus
> function form "is literally met by structure, materials, or acts in the
> accused device that perform the claimed function in substantially the
> same way to achieve substantially the same result.  The individual
> components, if any, of an overall structure that corresponds to the
> claimed function are not claim limitations.  Rather, the claim
> limitation is the overall structure corresponding to the claimed
> function.  This is why structures with different numbers of parts may
> still be equivalent under §112, P 6, thereby meeting the claim
> limitation…the relevant structure is that which 'corresponds' to the
> claimed function…further deconstruction or parsing is incorrect."

A28-29, A32-33.

Based on the out of context reasoning that "individual components…are not

claim limitations," the court failed to fully identify the corresponding structure,

which requires a determination of the structure in the written description that is *necessary* to perform the claimed function. *Altiris Inc. v. Symantec Crop.*, 318 F.3d 1363, 1375, 65 USPQ2d 1865 (Fed.Cir. 2003). The "corresponding structure *must include all structure that actually performs the recited function*." *Cardiac Pacemakers*, 296 F.3d at 1119 (emphasis added).

A third is a mistaken effort to consider the patent-in-suit as supporting multiple embodiments under §112(6), and then accommodating those embodiments by a single claim construction. This implicates the '780 patent's disclosure of a hydraulic system and absence of §112(6) support for alternative embodiments.

### 2.    The District Court's Claim Constructions

Claim 1, limitations 4, 2 and 5 are substantially similar to claim 9, limitations 4, 5 and 6, respectively, and the same constructions apply. Lenco therefore references its construction arguments to claim 1for clarity. However, the following arguments are also submitted in support of the corresponding limitations of claim 9.

### a.    Claim 1 - Limitation 2 (Claim 9 – Limitation 5)

The court's following construction of limitation 2 erred by omitting corresponding structure:

| Limitation 2: | means for selectively applying electrical power to said engine for powering the boat; |
|---|---|
| Court identified function: | "The function is to allow the operator to choose whether electrical power to the engine that runs the boat is on or off." |
| Court identified corresponding structure: | "The structure is a switch which turns the electrical power to the boat's engine on and off, and equivalents thereof." |

A27.

This limitation was added to claim 1 during prosecution and is substantially identical to a limitation in claim 9.[3]  The corresponding structure is not merely "a switch," but also includes an engine ignition control system.

As shown in Figure 1 and discussed in the specification, it is the connection of ignition key switch 36 with ignition control system 37 that provides the means for selectively applying electrical power *to the engine*.  The specification provides:

> An ignition key switch 36 selectively connects the ignition control system 37 of the boat engine to a source of electrical power, such as a battery 38.

A110, 2:44-47.

---

[3] This limitation is of import to Lenco's redesigned system that is responsive to engine RPM, as discussed below.

The structure "allow[ing] the operator to choose whether electrical power to the engine that runs the boat is on or off" is the ignition key switch 36 connected with the ignition control system 37.

### b.    Claim 1 - Limitation 4 (Claim 9 – Limitation 4)

The court also erred in identifying corresponding structure for limitation 4:

| Limitation 4: | "means carried by said hull and responsive to a boat operator for selectively adjusting position of said trimming means to maintain desired attitude under varying conditions" |
|---|---|
| Court identified function: | The function is to allow the boat operator to move and change the angle of the trim tabs from whatever position the tabs are in to the operator's choice of position so that a desired attitude is obtained. |
| Court identified corresponding structure: | The structure includes "operator switch 40" that is "coupled to battery 38 for selectively applying electrical control signals to motor 30 and valves 32, 34 which supply pressure to actuators 24 and 26 for adjusting the position of the trim tabs 12, 14 independently of each other," or equivalents thereof. |

The court further ruled "the inclusion of the 'valve' and 'pump' elements in this claim limitation are unnecessary." A27-28.

The court's identification does not include disclosed structure necessary for the operator to move and adjust the trim tabs:

> A pair of <u>hydraulic actuators 24,26</u> . . . A <u>fluid pump 28</u> [] powered by an <u>electrical motor 30</u> for supplying <u>hydraulic fluid</u> under pressure from a fluid source to actuators 24,26 through respective <u>solenoid-operated flow control valves 32,34</u> . . . An <u>operator switch 40</u> [] coupled to <u>battery 38</u> for selectively applying electrical control signals to motor 30 and valves 32,34 for adjusting position of trim tabs 12,14 independently of each other.

A110, 2:38-51; emphasis added.

All of the above underlined structure - hydraulic actuators and fluid, fluid pump, electrical motor, flow control valves, switch and battery - are necessary to perform the claimed function. For example, an operator could not adjust the trim tabs without each of those items. *See Cardiac Pacemakers*, 296 F.3d at 1116 ("[A]ctivation would occur even if the timer were not present. The timer therefore cannot properly be considered structure corresponding to the activating means.")

The court failed to identify all of the structure for limitation 4 as a result of attempting to accommodate multiple embodiments and due to an improper reliance on the doctrine of claim differentiation. As the court stated:

> 16.    The Court rejected Defendants' assertion that the structure of the fourth element of Claim 1 is limited to hydraulic trim tab adjustment mechanisms. First, the specification expressly states: "It will be appreciated, of course, that the principles of the invention apply to electrical or pneumatic actuators of trim tabs, in addition to the preferred hydraulic implementation." '780 Patent Col.3,ll.53-56. Furthermore, dependent claim 4 provides that the system includes "a fluid actuator." Because the limitation of "fluid actuator" is present in a dependent claim, independent Claim 1 should be read as broader than the dependent claim.

> *    *    *

29

18.    …the Court further concludes that a person of skill in the art of electrical actuators…would know that if they implemented the claimed system with an electrical actuator instead of a hydraulic actuator, they could eliminate the pumps and valves.

19.    Accordingly, the Court reaffirms its Claim Construction Order with the clarification that Claim 1 of the '780 Patent applies equally to electrical actuators as hydraulic actuators and the inclusion of the "valve" and "pump" elements in this claim limitation are unnecessary.

A27-A28(citation omitted).

Contrary to this ruling, the '780 patent does <u>not</u> support electrical embodiments for purposes of §112(6) by the bare statement that "[i]t will be appreciated, of course, that the ***principles*** of the invention apply to electrical or pneumatic actuators of trim tabs, in addition to the preferred hydraulic implementation."  A111, 3:53-56 (emphasis added).  *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 953, 83 USPQ2d 1118 (Fed.Cir. 2007) ("a bare statement that known techniques or methods can be used does not disclose structure.  To conclude otherwise would vitiate the language of the statute requiring 'corresponding structure, material, or acts described in the specification.'")

The '780 patent only details application of control circuit 42 to the hydraulic system by way of hydraulic pump motor 30 and flow control valves 32, 34.  There is no disclosure of a circuit for use with an electrical system, or how the circuit as disclosed would connect to and operate an alternative system.  *See Biomedino*, 490

F.3d at 953 ("[t]he inquiry is whether one of skill in the art would understand ***the specification itself to disclose the structure***, not simply whether that person would be capable of implementing that structure" (emphasis added, citations omitted)). The hydraulic actuators 24, 26 cannot simply be substituted with electrical actuators without further modification to the disclosed system. A simple substitution would be nonfunctional.

Whether there is sufficient disclosure of structure is "inextricably intertwined with claim construction." *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1379, 53 USPQ2d 1225 (Fed.Cir. 1999). The specification must set forth an adequate disclosure of §112(6) claim limitations to meet the enablement requirement of §112(2). *In re Donaldson Co.*, 16 F.3d 1189, 1196, 29 USPQ2d 1845 (Fed. Cir. 1994) (*en banc*).

Even if multiple embodiments were adequately disclosed in the '780 patent, straining for a single construction of this limitation erroneously omitted necessary hydraulic components in order to accommodate such embodiments. A district court is not required "to formulate a single claim interpretation to cover multiple embodiments." *Ishida Co., Ltd. v. Taylor*, 221 F.3d 1310, 1316, 55 USPQ2d 1449 (Fed. Cir. 2000) (a single claim construction encompassing all illustrated embodiments would be so broad as to defeat the notice function of the claims). Because electrical actuation would necessarily involve structurally different

components from the disclosed hydraulic embodiment, a single claim construction

encompassing such alternatives was improper. *Id.* at 1312-16.

The doctrine of claim differentiation was also used impermissibly. Claim

differentiation <u>cannot</u> override proper §112(6) interpretation that is based upon the

disclosure. *See Laitram Corp. v. Rexnord Inc.*, 939 F.2d 1533, 1538, 19 USPQ2d

1367 (Fed. Cir. 1991).

### c.    Claim 1 - Limitation 5 (Claim 9 – Limitation 6)

The court erred in identifying both the function and corresponding structure

of limitation 5:

| Limitation 5: | means coupled to said trimming means and to said engine, and responsive to removal of electrical power from said engine, for automatically moving said trimming means to a predetermined position with respect to said hull upon removal of power at said engine. |
|---|---|
| Court identified function: | "The function is to provide a means to respond to the stimulus of electrical power being removed from the engine, thus resulting in the trim tabs being automatically returned to the fully retracted position or other predetermined position." |
| Court identified corresponding structure: | "The structure is the control circuit 42, fig. 1, and equivalents thereof." |

A28-29.

### i. The Function Was Misidentified

Signaled by the preposition "for," limitation 5 recites the ***function includes*** "automatically moving said trimming means to a predetermined position…upon removal of power to the engine." *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258, 52 USPQ2d 1258 (Fed. Cir. 1999). That the "means" of limitation 5 is "coupled to said trimming means and to said engine" is a structural limitation on that means. Thus, the claimed function also requires the "means" to ***actually move*** the "trimming means."

Misidentifying the function as being "to provide a means to respond" to removal of electrical power from the engine, and thus merely "result in the trim tabs being automatically" moved without actually providing movement does not properly identify the function. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113, 63 USPQ2d 1725 (Fed.Cir. 2005) ("It is equally improper to broaden the scope of the claimed function by ignoring clear limitations in the claim language.")

### ii. Corresponding Structure Requires Hydraulic Components

A control circuit, without more, cannot physically move a trim tab. In view of the required "moving said trimming means" and the "means" being coupled to the "trimming means" and "the engine", the corresponding structure must include

33

those disclosed items that are (1) coupled with the trim tabs and engine, (2) responsive to removal of an electrical signal, and (3) physically move the trim tab.

As noted, the structure disclosed for physically moving the trim tabs includes hydraulic fluid, a fluid pump 28 powered by a pump motor 30, flow control valves 32,34, and actuators 24,26, with control circuit 42 being connected to pump motor 30 and flow control valves 32,34.   A110, 2:38-59.   Unlike limitation 4, however, operator switch 40 is not required for automatic retraction because control circuit 42 connects motor 30 and valves 32,34 to battery 38 independently of the switch.  A111, 3:11-13, 3:50-52.

To the extent the corresponding structure of limitation 5 and limitation 4 overlap, it is permissible for structure corresponding to a means clause to perform more than one function.  *Lampi Corp. v. American Power Prods. Inc.*, 228 F.3d 1365, 1374, 56 USPQ2d 1445 (Fed. Cir. 2000) (citation omitted).

### iii. Corresponding Structure Requires Specific Components of Circuit 42

Citing *Odetics*, the district court found the corresponding structure to be the block diagram circuit 42[4] of Figure 1 and rejected the component parts disclosed in Figure 2 as corresponding structure.   A28-A29.   This is contrary to precedent of this Court.

---

[4] Inventor Hagstrom confirmed circuit 42 in Figure 1 was simply a "block diagram." A5840:9-16.

34

Closely analogous is *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 64 USPQ2d 1812 (Fed.Cir. 2002), in which a claim directed to a variable color display device included the limitation of a "means for selectively activating said display light sources."   The accused infringer argued the district court's construction was "too broad, and misled the jury to believe that this limitation can be met by any structure broadly suggested by Figure 3, which shows only a ***block diagram***."   *Id.* at 1211 (emphasis added).   The accused infringer "requested an instruction limiting the structure to the ***circuitry*** shown in Figure 4."   *Id.* (emphasis added).   This Court agreed, finding "the district court's identification of the corresponding structure was incomplete. . . [A]s Figure 3 and its accompanying text serve merely as an ***overview*** for introducing and explaining Figure 4, ***the corresponding structures must necessarily be found in Figure 4***."   (emphasis added).   *Id.* at 1212.   This Court thus held "[t]he corresponding structure in the specification is described in Figure 4 and the accompanying written description."   *Id.*; *See also WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1349, 51 USPQ2d 1385 (Fed. Cir. 1999) (for computer means-plus-function claim, disclosed structure is not general purpose computer, but special purpose computer programmed with disclosed algorithm).

In nearly identical manner to *Texas Digital Systems*, Figure 1 of the '780 patent is merely a "block diagram" overview, with the structure being found in

Figure 2 and explained in detail in the specification:



The majority of the Detailed Description is focused on describing the components

of circuit 42 and their connection and operation with regard to the hydraulic trim

tab system.  A110-A111, 2:55–3:52.  Accordingly, the corresponding structure for

limitation 5 includes the structure described in Figure 2 and the accompanying

written description.  A110-A111, 2:59-3:46.  In particular, the circuit includes the

inhibiting components, timing components, and movement components.

## B.    Lenco's Products Do Not Infringe the '780 Patent

Lenco's original systems were ruled to literally infringe claims 1 and 9 when

installed directly to an ignition switch, and Lenco's re-designed RPM sensing

systems were ruled to literally infringe claims 1 and 9 when connected to a

tachometer on a boat.    A36¶45, A37¶51.    The district court further ruled

"installation of Lenco's ATRs infringe the '780 Patent, if not literally, then under

the doctrine of equivalents."  A38¶56.

36

Application of the claims to the accused device is a question of fact reviewable under a clearly erroneous standard. *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1582, 221 USPQ 929 (Fed. Cir. 1984).

### 1.    Installation of Lenco's Products did not Literally Infringe

For literal infringement of a means-plus-function limitation the accused device must perform the identical function to that recited in the claim, and use the same structure, materials, or acts found in the specification, or their equivalents. *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430, 54 USPQ2d 1129 (Fed. Cir. 2000). The test for equivalents is whether the differences between the patent's disclosed structure and that of the accused device are insubstantial. *Chiuminatta Concrete Concepts v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1309, 46 USPQ2d 1752 (Fed. Cir. 1998). Under §112(6) "an equivalent results from an insubstantial change which adds nothing of significance to the structure, material, or acts disclosed in the patent specification." *Valmont Industries, Inc. v. Beinke Manufacturing Co. Inc.,* 983 F.2d 1039, 1043, 25 USPQ2d 1451 (Fed. Cir. 1993).

While a claim limitation is the overall structure corresponding to the claimed function and not the individual components, "[s]tructural equivalence under §112, ¶6 is met only if…the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as

the underline{corresponding structure described in the specification}." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267-68, 51 USPQ2d 1225 (Fed.Cir. 1999).

> **a.    Lenco's Position-Counting Circuit is Substantially Different From the Patent's Inhibiting-Timing Circuit**

Circuit 42 of the '780 patent operates as a timing circuit by operating pump motor 30 and flow valves 32, 34 for a preset time duration to retract the trim tabs regardless of their position.  Prior to operating, circuit 42 charges-up and inhibits automatic retraction until switch 36 is opened.  Circuit 42 thus operates in an open-loop manner in that it does not and cannot monitor the position of the trim tabs.

The scope of equivalents afforded circuit 42 of the '780 patent is narrower due to the importance of the physical structure disclosed in the '780 patent specification to the claimed invention.  *IMS Technology,* 206 F.3d at 1436 (range of equivalent structures limited if the physical characteristics of the structure are critical in performing the claimed function)

Comparison of the Lenco control box circuitry design to the '780 patent reveals the complexity of the Lenco design over that of circuit 42. A4380-A4384. In contrast to the '780 patent circuit, the Lenco system does not operate to inhibit retraction and does not operate as a timing circuit to perform retraction.  At trial Bennett's expert acknowledged Lenco's circuit was complex and recanted the

position of his expert report that the circuit was simply a digital version of a timing circuit.[5]  A1917:14-23.

The Lenco circuit monitors trim tab position by counting pulses of the electric actuator motors and retraction is based on that known position – with the motors running until the pulse count returns to zero.   Not only is this a substantially different "way" of operation, but the pulse counting circuit enables the Lenco system to perform operations unattainable by circuit 42 of the '780 patent, that of providing the operator with the trim tab position by way of the switch indicator lights.  That difference was material.  The court found that Bennett lost sales due to the Lenco system being a "superior" product.  A55.   The alternative technology of the Lenco system that produces results unattainable by circuit 42 of the '780 patent is evidence that the Lenco devices are more than "insubstantially different" than the '780 patent and do not infringe.  *Gemstar-TV Guide Intl., Inc. v. ITC*, 383 F.3d 1352, 1365, 72 USPQ2d 1609 (Fed. Cir. 2004).[6]

---

[5] Bennett's expert admitted the '780 patent makes no reference to an indication of tab position.  A1886:6-12; A1919-A1923.  Bennett's expert also admitted he failed to study the majority of the '780 patent and did not completely understand the patent's disclosure (A1921:3-6) – he did not even review the written description or the structure shown in Figure 2.  A1937:25-A1938:9.  Nor did he understand the Lenco system until after he issued his report when the Lenco system was described to him at the deposition of the designer. A1901:25-A1902:16; A1919:9-13.

[6] That the district court failed to appreciate the Lenco system's ability to monitor actuator position as evidence of a substantially different "way" of operating was made clear by the court's statement agreeing the addition of "a bell and a whistle like an indicator light" does not make it any less infringing.  A1947:10-22.

Accordingly, even when wired to an ignition switch, installation of the Lenco systems do not literally infringe claims 1 and 9 of the '780 patent at least for the reason of not meeting limitation 5 of claim 1 and limitation 6 of claim 9.

### b.    Lenco's RPM based re-designed version is substantially different

Lenco's re-designed version enables the circuit to be wired to an engine RPM signal from a tachometer with self retraction occurring upon detection that engine speed has dropped below a predetermined level.  A2515:14-22, A2600:17-22.  Accordingly, the re-designed version also does not infringe the '780 patent because it operates responsively to engine RPM in the manner of prior art systems, which operation was disclaimed by Bennett during prosecution of the '780 patent.[7]

Bennett's expert failed to consider the amendment to the application made during prosecution (A1889:4-11; A1930:18-A1931:25), and was unaware that such amendments impact the issue of infringement.  *Id.*  As a result of the amendments and arguments made during prosecution distinguishing over RPM based systems, Bennett is precluded from asserting the '780 patent claims encompass an automatic control based on engine RPM.  Amendments and arguments made during prosecution to overcome rejections based on prior art limit a claim's scope and

---

[7] The district court ruled Lenco's RPM based system to be infringing merely based on its functional operation stating, "it still 'responds to the stimulus of electrical power being removed from the engine,' which is all that is required to find literal infringement."  A35¶44.

prevent the patentee from later arguing a broader scope of coverage. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-18, 75 USPQ2d 1321 (Fed. Cir. 2005).

This limitation is properly applied to both claims 1 and 9 due to their similar language and the characterization by the patent applicants that this aspect of the claims was similar. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347, 47 USPQ2d 1418 (Fed. Cir. 1998). Moreover, the doctrine of equivalents cannot be used to interpret a claim in such a way that it encompasses the prior art. *Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 8 USPQ2d 1323 (Fed. Cir. 1988). As discussed in more detail below, in addition to Takeuchi that was of record during prosecution, Newman Patent 4,872,857 precludes expansive determination of equivalents.

Accordingly, the re-designed Lenco systems responsive to engine RPM practice the prior art methodology disclaimed during prosecution and cannot infringe.

### c.    Lenco's electrical implementation is substantially different from the patented hydraulics

Separate from a comparison of the control circuitry, no comparison was made of whether the differences between Lenco's electrical systems relative to the hydraulic system of the '780 patent were insubstantial. The ruling that Lenco's systems infringed claim 1 instead merely held "electrical trim tab systems are well within the scope of Claim 1 of the '780 Patent as set forth in this Court's Claim

Construction Order" (A32¶32) and regarding claim 9 held "[t]he Lenco trim tab systems also satisfies element 4 of Claim 9 because they use electrical actuators and both models…include operator switches that are to be coupled to a battery in order to adjust the position of the trim tabs."  A36¶48.

That approach was in error and Bennett did not prove the Lenco systems to be an equivalent to the corresponding structure of claim 1, limitation 4 and claim 9, limitation 4.  A proper claim interpretation includes a motor 30 that drives fluid pump 28 to provide pressurized hydraulic fluid by way of valves 32,34 to hydraulic actuators 24,26.

The differences between the hydraulic and electric screw actuators are material.  The court found that difference as well as the difference in installation of Lenco's electric actuators was the reason Rinker bought Lenco's systems, along with warranty issues.  A16.  Evidence established that compared to hydraulics Lenco systems provided a faster response time between the operator pressing the button to reaching the desired position; were faster to install; and avoided problems associated with use of hydraulic fluid, such as leaks and inventories.  A6316:8-23; A6297:19-24; A2668-A2670.

Bennett's expert acknowledged that he did not compare the differences between the Lenco system and the corresponding structure identified by the court in its original interpretation.  A1934-A1935; A3440, A3469-70, A3479.

42

The differences presented by the Lenco systems and bases for their noninfringement were elaborated by Lenco's expert, who testified how claim 1, limitation 4 and claim 9, limitation 4 were not met, nor represented an equivalent. A2748-A2756; A2778-A2779.

### d.    No evidence that Lenco's original systems were wired to self-retract based on removal of engine power

No evidence was presented at trial to establish that boat manufactures wired the Lenco systems relative to the "means for selectively applying electrical power to [the] engine" such that they would retract upon "removal of electrical power from said engine" within the meaning of claim 1 (limitations 2 and 5) or claim 9 (limitations 5 and 6). The prosecution amendment to distinguish Takeuchi highlighted these elements and confirms the need for this proof that is absent from the record.

At trial, Bennett ignored the requirement of claims 1 and 9 that retraction be responsive to removal of the electrical power from the engine. Of record was evidence that boat engine key switches, like those of automobiles, include terminals for both engine ignition and accessory wiring. Bennett presented no evidence that any boat manufacturers connected Lenco systems to the portion of the ignition key switch controlling engine ignition power. Bennett's expert did not inspect a Lenco trim tab system connected to an actual boat ignition switch and ignition system. A1886:13-22.

43

### i.  Boat Engine Key Switches

As made of record, boat engine key switches are not merely a simple "on/off" switch, but instead typically include two outputs – one to the engine for ignition and another to power accessories such as a radio when the boat is not running.  A2658:24-A2659:22.

The Lenco systems could be wired with the orange "accessory wire" to the accessory terminal of the switch.  The system would then not operate in response to removal of power from the engine, but only in response to removal of accessory power.  A2560:11-A2561:3; A2658:24-A2661:14.  When the key is turned to the accessory position, engine power is shut off but the Lenco system would not retract.

The only way to determine how the orange wire was connected would be to physically examine the connection of the orange wire to the key switch. A2660:12-A2661:11.   Bennett's expert made no such inspection.    A1886:13-A1888:6.

### ii. Bennett's Investigations

Bennett introduced generalized testimony regarding observation of Lenco systems retracting when the key switch was turned to the "off" position.  That testimony was confined to situations in which the boat was out of the water and would not be turned on, such as at a boat show, dealership or factory during

installation.    A1571; A1589; A1593; A1603-A1607; A1614; A1617; A1625-A1626; A1631-A1635; A1637; A1797; A1812-A1814; A3130-A3136.    These observations were made when the engines were not running, the particular key switch position wiring was not inspected or retraction was simply assumed would occur.  Testimony regarding removal of a Lenco system from a Rinker boat failed to establish the boat was then turned on or the key position of the wiring.  A1558.

Bennett's failure of evidence fails to establish that Lenco's original systems were wired to ignition key switches such that they would retract upon removal of engine power, as required by claims 1 and 9.

## 2.    Installation of Lenco's Products did not Indirectly Infringe

Lenco's systems were erroneously held to infringe under the doctrine of equivalents based on a determination that Lenco's control circuit was interchangeable with that shown in the '780 patent to accomplish the ***claimed function***.  This was stated as follows (A38-39):

> 56.    The installation of Lenco's ATRs infringe the '780 Patent, if not literally, then under the doctrine of equivalents.  The Lenco control circuit is interchangeable with the control circuit 42 of the '780 Patent. (citations omitted).
>
>        *    *    *
>
> 59.    Thus, Defendants' own expert and engineer concede that a pulse system or other circuits equally well known to electrical engineers at the time the '780 Patent was filed, could be used interchangeably to accomplish the claimed function of the control circuit 42, as identified by this Court above, namely to "provide a means responsive to the stimulus of electrical power being removed from the engine."

This reliance on interchangeability was misplaced. In the context of literal infringement of means-plus-function claims, this Court previously rejected this argument, "[a]lmost by definition, two structures that perform the same function may be substituted for one another. The question of known interchangeability is not whether both structures serve the same function, but whether it was known that one structure was an equivalent of another." *Chiuminatta Concrete Concepts v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1309, 46 USPQ2d 1752 (Fed. Cir. 1998).

In contrast, "a finding of a lack of literal infringement for lack of equivalent structure under a means-plus-function limitation may preclude a finding of equivalence under the doctrine of equivalence." *Id.* at 1310. The doctrine of equivalents may be applied in the §112(6) context to technological advances that are developed after a patent is granted where the advances constitute an insubstantial change from what is claimed. *Id.* If the accused structure does not involve later-developed technology, "a finding of non-equivalence for §112, ¶6, purposes should preclude a contrary finding under the doctrine of equivalents." *Id.* at 1311.

Testimony established that the Lenco control box does not utilize technology developed after issuance of the '780 patent. (A2538:16-A2540:5) and the court found the "pulse input" system employed by Lenco to be known at the time the

'780 patent was filed.  A38¶57.  Accordingly, the doctrine of equivalents does not apply.

## C.    DeVito and Lenco Did Not Induce Infringement

The specific intent necessary to induce infringement "requires more than just intent to cause the acts that produce direct infringement… [T]he inducer must have an affirmative intent to cause direct infringement."  *DSU Med. Corp. v. JMS Co.*, *Ltd.,* 471 F.3d 1293, 1306, 81 USPQ2d 1238 (Fed. Cir. 2006).

There was no finding or argument that Lenco was a sham corporation or for piercing the corporate veil of Lenco.  The district court made no separate finding as to whether DeVito somehow acted in a personal capacity, but found "that DeVito's acts, individually and on behalf of Lenco, induced Rinker's direct infringement of the '780 Patent."  A50¶104.

It is undisputed that Lenco's systems do not infringe when wired to certain types of switches (A8¶32) and, therefore, have substantial non-infringing uses. Moreover, Lenco always maintained its systems did not infringe the '780 patent even when wired to an ignition switch.  A2155:13-25; A2187:12-A2188:7.  Upon receiving a cease and desist letter from Bennett (A3036-A3037), Lenco, through DeVito, consulted with its attorneys, whom then responded denying Bennett's allegation of infringement and raising invalidity defenses.  A2151:5-A2152:8;

A4766-A4770 [8].   In forming that response, DeVito had the designer provide information to Lenco's attorneys regarding operation of the Lenco system. A2533:12-A2534:2.

Lenco also specifically denied infringement in the settlement entered into with Bennett.  A3049.  That agreement required Lenco, in part, to provide notice to all of its customers that the Lenco systems were to be wired to boats in a particular manner.  A3051.  The court found Lenco complied with all obligations under the Settlement Agreement, "with the exception of paragraph ten of the Settlement Agreement."  A11¶50.  That paragraph provided that Lenco would "not advise or counsel" its systems to be wired in an alternative manner.  A3051-A3052.  Neither Lenco nor DeVito, however, violated this provision.

The ruling of induced infringement was based on (1) testimony by various boat manufacturers regarding their discussions with DeVito after those manufacturers were sent cease and desist letters by Bennett (A49¶100-A50¶102); (2) Lenco's providing of indemnification agreements to Lenco customers contacted by Bennett (A49¶99); and (3) Lenco's honoring of warranties without asking how the devices were wired.  A50¶103.

---

[8] In its response to Bennett's attorneys, Lenco's attorneys had a misunderstanding of the operation of the Lenco system as it relates to operating as a timing device. As set forth above and agreed to by Bennett's expert, the Lenco system does not operate as a timer.

None of the testimony cited by the court or any evidence introduced by Bennett establishes that anyone at Lenco advised anyone after the date of the Bennett-Lenco settlement to wire a Lenco system to a key switch. Lenco was found to have complied with all other provisions of the Agreement.

Lenco's discussions after Rinker received a cease and desist letter centered on whether there was infringement and Lenco's ongoing efforts to resolve the problem, and not the manner of Rinker's wiring. A2292:10-19; A2687:14-A2688:6; A2719:4-A2720:18; A6046:8-19: A6048:5-16: A6054:1-24; A6056:6-9; A6-059:13-16; A6060-A6061. There is no evidence that when Lenco discussed the dispute, Lenco believed Rinker was wiring the equipment other than conforming to current Lenco materials. A2244:25-A2245:4; A2287:16-A2289:9; A2292:1-19; A2297:13-18; A2714:20-A2716:5; A6058:13-20.

Lenco did not enter into indemnification agreements to somehow assist in infringement. Instead, the indemnifications with Rinker and others were based upon advice of counsel and made to defend customers from a competitor "bully." A2186-A2187:5;A2291-A2294; A2296:3-23; A2306:10-A2307:9; A2309:14-16.

Just prior to Bennett's letter charging Rinker with infringement, Bennett made an effort to get Rinker to change to Bennett equipment but was unable to overcome concerns unrelated to self-retraction. A1976:6-A1977:8; A1981:1-10; A2012-A2015; A2676-A2684; A2686:16-A2687:4; A2724:14-23; A4397; A4400;

49

A4779-A4780; A4782. Bennett intermingled threats with these sales communications, and Rinker understood this to be an overall marketing approach by Bennett. A2012:16-21; A2019-A2021; A2717:16-A2718:5; A2686:16-A2687:4; A6043:5-A6045:22; A3432-A3439.

To the knowledge of DeVito and the Lenco employee responsible for warranties, Lenco never honored a warranty where they knew the system had been wired inconsistently with the settlement agreement and the employee confirmed that he destroyed all prior wiring instructions. A2176:16-33; A2357-A2379.

The court's reliance on the fact that Lenco had not inspected or purchased a Bennett ATR is irrelevant – the issue of infringement involves the '780 patent and not Bennett's product. A50¶106. Lenco's attorneys provided Bennett with a written position of non-infringement (A4766-A4770), establishing that Lenco consulted with its attorneys and provided an objectively reasonable response of non-infringement, a position maintained today.[9]

---

[9] The district court's adoption of Bennett's proposed findings of fact are also misleading regarding Mr. Martin purportedly advising Mr. DeVito that he "had concerns" about whether Lenco's device fell within the scope of the '780 patent claims. A51¶¶108-109. The cited testimony establishes that Mr. Martin, whom is not an attorney, indicated he was uncertain of the scope of means plus function claims and that Mr. DeVito should discuss the issue with an attorney, which he did. A2584-A2588. Mr. Martin also corrected himself that it was not until 2001 when he first saw the '780 patent. A2656-A2657.

**D.    No Willful Infringement As a Matter of Law**

It was Bennett's burden to prove (1) as a matter of law subject to *de novo* review that from an objective standard Lenco acted recklessly in the face of Bennett's infringement allegations, and (2) by clear and convincing evidence that Lenco acted despite subjectively recognizing this objectively-defined recklessness which was known or so obvious that it should have been known to Lenco, subject to a clearly erroneous standard of review.  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1007, 103 USPQ2d 1088 (Fed.Cir. 2012).

**1.    Lenco Relied on Objectively Meritorious Defenses and There Was No Determination of Objective Recklessness**

The court failed to make the necessary determination that Lenco was objectively reckless in relying on any of its defenses – including non-infringement, and invalidity based upon an on-sale bar, prior art and/or indefiniteness.  *E.g., Bard*, 682 F.3d at 1006-07.  As this Court has observed:

> Following *Seagate*, this court established the rule that generally the "'objective' prong of *Seagate* tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement.  *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010).[10]

*Bard*, 682 F.3d at 1006.

---

[10] In the present case, trial submissions were concluded in 2009, with the exception of briefing on the decision of *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060 (2011).

As detailed on this appeal, Lenco's defenses are clearly reasonable. Lenco's non-infringement defense is based, in the first instance, on the basic difference between Lenco's electrical actuator-based system and the properly interpreted asserted claims. Detailed in section V.A. is Lenco's position regarding the proper interpretation of the means-plus-function limitations based upon closely analogous precedent of this Court, while section V.B. provides the corresponding analysis for non-infringement.

Well before the filing of the present action, attorneys for Lenco informed Bennett's counsel of the limited scope of the claims under §112(6) and the resulting non-infringement by the Lenco products. A4766-A4770. Lenco's counsel that engaged in that exchange was of record on Lenco's Markman claim interpretation filing. A126-A146. The claim interpretation issues here involved are complex, and the court's original ruling alone took twenty-two months from briefing to rendering. A70, A77.

When the court rendered its claim interpretation, Bennett moved for "clarification." A300. The court interpreted certain §112(6) limitations as including elements such as "motor 30, which powers a drive that supplies pressure through valves 32, 34" such that Bennett was "concerned that the reference to "valves" and "pressure" may be interpreted to suggest that these elements are limited to the use of the invention with hydraulic (and perhaps pneumatic)

actuators." A302.  That concern was prompted by Lenco's argument that the claims were limited to hydraulic actuators (A301), which continues to be significant regarding claim interpretation and non-infringement.  A28¶17-19, A33¶35, A31-32.  The court made no change at that time and thus Lenco operated under that interpretation, but after trial the court changed its interpretation.  A28.  This retroactive alteration cannot provide a fair basis for willfulness.

Moreover, the court ruled Lenco's systems were always capable of non-infringing installation, so that the product as manufactured and sold by Lenco did not in itself constitute an infringement.  A8¶32.  Bennett's allegations regarding purported "copying" and efforts to design around the patent are not relevant toward the objective determination of recklessness.  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1337, 90 USPQ2d 1865 (Fed.Cir. 2009).  Nonetheless, the court found Bennett lost sales due to the Lenco system "being a superior product, not due to the automatic retraction," (A55), and Rinker bought Lenco in part because it was non-hydraulic and its ease of installation.  A16.

The original exchange by Lenco's counsel also raised an on-sale defense due to Bennett's new product announcement for the Bennett commercial product.  See A4764.  That invalidity defense was presented at trial, which the district court characterized as Lenco's "main defense to Bennett's claims of inducement and direct infringement."  A18¶76.  A defense may be reasonable even though it proves

unsuccessful.  *See Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319, 96 USPQ2d 1640 (Fed.Cir. 2010); *DePuy Spine*, 567 F.3d at 1336-37.

Lenco's additional invalidity defenses founded on prior art (A20-A23, A42-45) and indefiniteness (A46-A47) were based upon an analysis of the file history and prior art that was addressed to that history, and arose due to Bennett's over-inclusive claim interpretation.

### 2.    A Determination of Willfulness Was Not Supported By the Record

The stated basis for determination of willfulness by Lenco and DeVito was "because they received repeated actual notice of the '780 patent, and continued their infringing acts in complete disregard for Plaintiff's rights."  A52,¶115.  Not only did the court fail to make a determination of objective recklessness, but the various relevant factors were not considered.  It was simply presumed Lenco knew there was infringement, based on the district court's treatment of the claims as covering any device that performed the stated function, and thus Lenco was precluded from even challenging Bennett's subjective conclusion.

A number of factors are relevant to the question of willfulness, all of which establish error in the willfulness determination regardless of outcome on other defenses.  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27, 23 USPQ2d 1426 (Fed.Cir. 1992) (overruled on other grounds).

i.  The Lenco trim tab system is undeniably not a copy of either the system as disclosed in '780 patent or Bennett's commercial ATR device.  This is true regardless of interpretation of the §112(6) claim elements.  The court found customers chose Lenco's as being the "superior product."  A55.  Lenco's systems were designed without knowledge of the '780 patent, and the court erred in determining otherwise. A2533:12-19; A2504:19-21.

The differences between Bennett's hydraulic system and Lenco's electrical actuator system were significant enough to be exploited by Lenco in marketing.  A3345-AA3347;  A3358-A3359;  A3381-A3382, A4804-A4808.    The court determined the Lenco system could be installed so as to not infringe the '780 patent.  A8¶32.

ii.  Upon learning of the '780 patent, Lenco investigated the scope of the patent through counsel.  That counsel in turn transmitted its analysis to Bennett and raised questions of invalidity.  A4764-A4770.

iii.  Lenco acted in good faith in prosecuting the litigation.  At the start of trial Bennett's counsel even pointed out that the case had been relatively free of problems.  A1278:10-12.

iv.  There was no evidence of a size disparity between Bennett and Lenco.

v.  No determination was made on the reasonableness of Lenco's defenses. This Court can itself assess closeness of the case.

vi.  Lenco initially entered into a settlement with Bennett in order to end the dispute.  The court determined that at least prior to the revised system in 2006, Lenco fulfilled its obligations under the Settlement Agreement with possible exception of unintentional breach of one paragraph.  A11¶50.  Thereafter Lenco's activities were undertaken while it was actively asserting its defenses in court.

vii.  Lenco designed its revised system to implement the distinction Bennett made in a prosecution amendment (A4784-91) that restricted equivalents to a control circuit wired directly to a switch.

viii.  The court found customers chose Lenco's as being the "superior product," not automatic retraction.  A55.  Lenco's acts were not pernicious.

ix.  There is no evidence that Lenco sought to conceal their activities. A1689-90.

### 3.    Lenco Relied On Evidence Of An On Sale/Printed Publication

As stipulated, Bennett's "ATR" embodies the invention of the patent-in-suit. (A880¶3).  Lenco introduced substantial evidence to establish the invention was ready for patenting and distribution of a sales brochure offering the ATR for sale prior to the August 30, 1989 critical date.

Inventor Hagstrom established the circuit drawing was created by May 10, 1989, for use in existing systems.  A4391-A4392; A5872-A5873; A5953.  The system was tested and by May 10, 1989 Hagstrom knew the system would operate

for its intended purpose.  A5874-A5877.  Bennett's design activities were complete before August 9, 1989, and a production order was authorized August 16, 1989. A4447-A4458; A5883-A5896.

Lenco introduced evidence to establish Bennett's Marketing Manager, Nelson Wilner, sent letters on August 14, 1989 to customers introducing the ATR and enclosing a printed product brochure describing the ATR.  A4389-A4390; A4417; A4427; A4471-A4473; A6567-A6571; A6611-A6622; A6638-A6639. The brochure mailed with letters dated August 14, 1989 included retail pricing. A6616-A6618; A4471-A4473.  Bennett's distributors knew their retail price discounts, and from the letter and brochure knew the price and that they could purchase the product.  A6600-A6605; A6630-A6641.

Wilner wrote and sent the August 14, 1989, letters and brochure to sell the ATR product, which were sent to let distributor customers know the product was available to purchase.  A6638-A6639; A6642-A6644.

Per Wilner, the brochure and letter was mailed to all Bennett's "after-market customers," one letter used for US sales agents and one for foreign customers. A4390; A4426; A6566-A6573; A6588-A6590; A6613-A6615.  Wilner's normal practice was to mail letters the day dated, and at the latest the brochure was mailed within one or two business days of Monday, August 14, 1989.  A6569; A6638.  At

that time it took five days for mail to be received by Bennett's international customers. A1458.

Notwithstanding absence of personal knowledge, Bennett's president questioned the draft nature of the letters, and provided self-serving speculation contradictory to Wilner who was responsible for them. A19. Wilner was only uncertain whether the mailing was to US or foreign recipients, not when the letters were mailed. A19; A6566-A6590.

The court noted there was no direct evidence that the letter was received (A19), but the offer date is the effective "on sale" date. *J.A. LaPorte, Inc. v. Norfolk Dredging Co.,* 787 F.2d 1577, 1582, 229 USPQ 435 (Fed.Cir. 1986). An offer to sell is sufficient to bar a patent. *In re Theis*, 610 F.2d 786, 791, 204 USPQ 188 (CCPA 1979). Lenco reasonably relied on invalidity of the patent-in-suit.

Moreover, given the evidence of Bennett's intent, number of copies of the brochure made, availability and dissemination, Lenco reasonably asserted a printed publication defense. *In re Hall*, 781 F.2d 897, 899, 228 USPQ 453 (Fed. Cir. 1986).

## E.    <u>Lenco Did Not Breach The Settlement Agreement</u>

Bennett had the burden of proving that Lenco breached the Settlement Agreement. *A.R. Holland, Inc. v. Wendco Corp.*, 884 So.2d 1006, 1008 (Fla. 1st DCA 2004); Ryan, LLC v. Evans, 2012 WL 1532492 (M.D. Fla. March 20, 2012).

The lower court's interpretation of the Settlement Agreement is reviewed de novo and its findings of fact are reviewed under the competent and substantial evidence standard. *Boca Concepts, Inc. v. Metal Shield Corp.*, 78 So. 3d 567, 570-571 (Fla. 4th DCA 2011).

The lower court erred in finding that Lenco breached Paragraph 10 of the Settlement Agreement "by manufacturing and distributing an infringing product … [t]hus, Lenco has counseled and advised its customers to use its retraction device in a manner other than as shown in Appendix B of the Settlement Agreement." A53. Even if Lenco's product infringed, "manufacturing and distributing" it did not violate paragraph 10 which required active inducement in the form of "advising" or "counseling." Bennett produced *no* evidence at trial, let alone competent or substantial, of any statement by DeVito, or anyone else from Lenco, "advising" or "counseling" customers to ignore the revised wiring instructions in the Settlement Agreement. *See* Section V.E. pp. 18-21, herein.

Moreover, because the lower court ruled that Lenco was only liable for acts of infringement occurring *after* the Settlement Agreement (A2-3), Bennett had the burden of proving that any trim tabs wired contrary to the Settlement Agreement were installed post-settlement. Bennett's inability to produce any evidence of that was fatal to its contract claim. *See* Section V.E. pp. 18-21, herein.

The lower court also erred in finding that Lenco's agreement to indemnify customers as to any infringement action by Bennett violated paragraph 10. First, Bennett presented no evidence that, as part of the indemnification, Lenco "counseled" or "advised" anyone to wire its product contrary to the Settlement Agreement. Second, an indemnification agreement, alone, does not establish intent to induce infringement unless its primary purpose is to overcome the deterrent effect that the patent laws have on would-be infringers. *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378, 76 USPQ2d 1276 (Fed.Cir. 2005).

Here, Lenco's primary purpose in indemnifying its customers was not to "advise" or "counsel" infringement, but to counteract the desperate, and even unscrupulous, sales tactics that Bennett had been engaging in to "win back" customers it had lost to Lenco. *See* Section V.E. pp. 18-21, herein. Lenco had a legitimate business reason for the indemnifications - it did not want to lose customers that it had won over with a "superior" product. A15-16, A55.

The lower court failed to recognize that Lenco's indemnification actually evidenced *no* infringement. Had Lenco believed it was inducing infringement, it would never have agreed to the indemnifications which, in the event of a lawsuit, would expose it to a plethora of damages.

60

Despite not awarding Bennett any additional damages for breach of the Settlement Agreement, the lower court's error in finding that Lenco breached Paragraph 10 was not harmless as it resulted in further legal error. It precluded the lower court from enforcing Paragraph 13 of the Settlement Agreement which barred this action so long as Lenco was in compliance. A52.

## F.  The '780 Patent was Invalid

The ultimate conclusion of invalidity is one of law. Anticipation is a fact issue reviewed for clear error. *Atofina v. Great Lakes Chemical Corp.*, 441 F.3d 991, 995, 78 USPQ2d 1417 (Fed.Cir. 2006). Obviousness is a question of law reviewed de novo, based on underlying factual issues reviewed for clear error. *Alza Corp. v. Mylan Laboratories, Inc.*, 464 F.3d 1286, 1289, 80 USPQ2d 1001 (Fed.Cir. 2006).

The court only found infringement of claims 1 and 9, and ruled that Patent No. 4,872,857 to Newman ("Newman"; A4492) neither anticipated nor rendered those claims obvious. When the claims are interpreted as Bennett argued to find infringement, the court clearly erred in determining the claims were not invalid.

### 1.    Anticipation by Newman

Although not considered during prosecution of the '780 patent, Newman also discloses automatically positioning a boat trim apparatus in response to engine RPM. A4492-A4406. A patent is invalid under §102 if an item of prior art

includes all elements of the claim. *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1574, 227 USPQ 177 (Fed.Cir. 1985). Lenco's expert, McAlexander, detailed how Newman discloses and thus anticipates every element of claims 1 and 9. A2821-A2836, A4593-A4623.

Newman discloses a device that automatically positions the boat trim apparatus into one or more preprogrammed positions based on a sensed condition, including the trailering position. A4500, 1:6-10. The various positions are selected by use of a series of buttons. A4503, 5:46-54. The trailering position operates in response to sensing that the engine is stopped by way of an engine speed sensor for monitoring RPM. A4502, 3:1-14; A4503, 5:22-24. Movement into the trailering position occurs when the sensed engine speed RPM is zero. A4504, 8:59–A4504, 9:5.

With the trailering position function enabled by pushing the appropriate button, nothing will happen while the engine is running. Once the engine key is turned off the boat motor will retract into the trailering position because the engine stops and the RPM decreases to zero. A2830:6-A2833:1. It is irrelevant that in the Newman system the trailering function is enabled by first pushing a particular button since subsequent retraction occurs in response to the engine key such that claim 1, limitation 5 and claim 9, limitation 6 read on the Newman patent. *SSIH Equipment S.A. v. U.S. I.T.C.*, 718 F.2d 365, 378, 218 USPQ 678 (Fed.Cir. 1983).

Newman and the Lenco systems each disclose closed-loop systems that monitor and track position and control the trimming mechanisms based on the known position. Both Newman and the re-designed Lenco system operate to initiate retraction into a fully retracted or trailering position in response to sensed engine RPM. A2836:18-A2837:18. The determination of infringement by the Lenco product establishes anticipation by Newman. *Upsher-Smith Labs, Inc. v. Paulab, LLC*, 412 F.3d 1319, 1322-23, 75 USPQ2d 1213 (Fed.Cir. 2005).

Newman initiates retraction into the trailering position in response to sensing zero engine RPM. In like manner, the re-designed Lenco system includes the feature of responding to a drop in engine RPM below a predetermined threshold to initiate retraction, and was determined to infringe because the engine RPM drops below that threshold to zero when the key is turned off. Accordingly, Newman satisfies this further limitation of claims 1 and 9.

Newman discloses a pivoting outboard motor system and not traditional "trim tabs" mounted directly to a boat hull. However, as explained by McAlexander, the prosecution history of the '780 patent establishes that the disclosed outboard motor of Newman satisfies the "trimming means" limitation of claim 1 and pivotal trim tab limitation of claim 9. A2837:19-A2839:5. Takeuchi (A4544-50) discloses an outboard motor, which the examiner cited as anticipating and implicitly found to satisfy the trimming limitations of claims 1 and 9. A4785.

63

The inventors never argued that Takeuchi was inapplicable based on it disclosing an outboard motor system.

Moreover, it is known and obvious to boaters that cavitation plates incorporated on outboard motors pivotally mounted to boat hulls impart trimming to the boat when the motor is pivoted. Thus, cavitation plates that are pivotally mounted to the boat hull by way of the outboard motor are the functional and structural equivalents of trim tabs pivotally mounted to a boat hull. A2397:16-A2399:2; A2543-A2544.

### 2.    Newman Renders The Claims Obvious

A patent is also invalid if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art. 35 U.S.C. §103(a); *In re DBC*, 545 F.3d 1373, 1377, 89 USPQ2d 1123 (Fed.Cir 2008). An obviousness analysis under §103(a) includes determining: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) against these, secondary considerations of nonobviousness may be considered. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 148 USPQ 459 (1966). "[T]he combination of familiar elements according to known methods is likely to be obvious when it does

no more than yield predictable results." *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 415, 82 USPQ2d 1385 (2007).

The court erred as a matter of law in concluding Newman did not render the claims obvious when considered with other prior art. Lenco's expert McAlexander detailed with specificity the obviousness of the claims in view of Newman and additional prior art. A2839-A2849; A4624-A4682.

### a.    Level of Ordinary Skill in the Art

Bennett's expert Urban opined the level of ordinary skill to be an individual having a Bachelor's degree in electrical engineering. A3444. The opinion of Lenco's expert was not significantly different, although included two to three years of control circuit design or application experience. A2819:16-24. Neither opined the need for any knowledge of boating, boats, or trim tabs.

### b.    Other Prior Art in Combination with Newman

As testified by Lenco's expert, it would be obvious to a person of ordinary skill to combine the teachings of Newman with patents directed to systems in which a trim tab is mounted to a boat hull, including Bennett's own Patent 3,695,204 (A4479) and Kercheval Patent 3,468,278 (A4518).

To the extent the Newman patent is considered not to disclose responding to removal of ignition power to initiate automatic positioning, this feature is also disclosed by Nakase 5,097,188 (A4559) which discloses retraction of an

automobile antennae in response to turning the ignition key switch to off.  A4559.

It would have been obvious to the person of ordinary skill in the art of electronic

circuit design and application to incorporate the control triggering mechanism of

the Nakase patent with the Newman patent.  A2845-A2846:7.  Finally, to the

extent it is argued Newman does not disclose the open-loop timing circuit of the

'780 patent, equivalent circuits were known in the prior art.  The 555 timing

circuits were stipulated to be prior art to the '780 patent and both experts testified

regarding the conventional nature of 555 timer circuits.     A880¶8; A2963:6-

A2964:1; A3457; A3462-A3464.

## VIII.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT

In view of the above, Lenco and DeVito seek correction of the claim interpretation, and reversal of the determinations of infringement, inducement of infringement, willful infringement, breach of contract, and conclusion that the patent-in-suit is not invalid.

Respectfully submitted,

/s/ Eric C. Christu
Eric C. Christu, FL Bar No. 434647
Echristu@shutts.com
Danet Rodriguez Figg
Shutts & Bowen, LLP
Shutts & Bowen, LLP
525 Okeechobee Blvd., Suite 1100
West Palm Beach, FL 33401
561-650-8556(ph)
561-671-5900(fax)

Terence J. Linn
linn@glbf.com
Karl T. Ondersma
Ondersma@glbf.com
Gardner, Linn, Burkhart & Flory, LLP
2851 Charlevoix Drive SE, Suite 207
Grand Rapids, MI 49546
616-975-5500(ph)
616-975-5505(fax)

Barry Haley, Esq.
blh@mhdpatents.com
Malin, Haley & DiMaggio, P.A.
1936 South Andrews Ave.
Ft. Lauderdale, FL 33316
954-763-3303(ph)
954-522-6507(fax)

*Counsel for Appellant*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Date Filed | Docket No. | Description | Page No. |
|---|---|---|---|
| 9/29/2011 | 440 | Findings of Fact and Conclusions of Law | A1 |
| 3/2/2012 | 467 | Second Amended Final Judgment | A59 |
| 3/16/2004 | 1 | US Patent No. 5,115,780  (filed as Exhibit A to the Complaint) | A108 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60326-CIV-MARRA/JOHNSON

BENNETT MARINE, INC.,
a Florida corporation,

      Plaintiff,

vs.

LENCO MARINE, INC.,
a Florida corporation, RINKER
BOAT COMPANY, a Delaware
limited liability company, RICHARD
DeVito, JR., an individual and KIM
SLOCUM, an individual

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law, which are based upon consideration of all admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses.

## I. FINDINGS OF FACT

A.      The Parties

1.      Bennett Marine, Inc. ("Bennett") is a Florida corporation with its principal place of business in Deerfield Beach, Florida. Bennett designs, manufactures and sells trim tab systems for use on powerboats. Bennett, Tr. (1/26), at 40:14-25.

2.      Lenco Marine, Inc. ("Lenco") is a Florida corporation with its principal place of business in Stuart, Florida.  Lenco designs, manufactures and sells trim tab systems for use on powerboats in direct competition with Bennett.  DeVito, Tr. (2/2), at 1009:23-1011:6.

3.      Rinker Boat Company, LLC ("Rinker") is a Delaware limited liability company with its principal place of business in Indiana.  Rinker manufactures and sells powerboats, including powerboats that utilize trim tab systems.  Slocum, Tr. (1/28), at 703:6-7.

4.      Richard DeVito, Jr. ("DeVito") is the president of Lenco.  DeVito, Tr. (2/2), at 1009:16-20.

5.      Kim Slocum ("Slocum") is the president of Rinker.  Slocum, Tr. (1/28), at 703:2-5.

<u>B.      Bennett's Patented ATR</u>

6.      Blake Bennett has been the President of Bennett Marine since 1979 and it is his overall responsibility of running the company. Bennett, Tr. (1/26), at 39:19-20, 40:2-5.  Blake Bennett is also an inventor of the '780 Patent, which is the patent at issue in the instant litigation.  Bennett, Tr. (1/26), at 65:16-19.

7.      The purpose of the '780 patent was to provide a trim tab control system that includes the ability for automatically returning the trim tabs to the fully retracted positions when the engine operation is terminated.

8.      Blake Bennett conveyed the conception of his invention to David Hagstrom, Bennett's then in-house electrical engineer, and Mr. Hagstrom designed an electrical circuit that would cause the trim tabs to automatically retract upon shutting off of a boat's engine. Bennett, Tr. (1/26), at 59:3-61:25, 62:12-14; Designated 4/7/05 Hagstrom Depo., at 44:10-46:22.

9.      Bennett first displayed a prototype of its Automatic Trim Tab Retractor ("ATR") to the

public during the International Marine Trade Exhibit and Conference (IMTEC) trade show in Chicago in September 1989. Bennett, Tr. (1/26), at 63:19-20. The ATR was in production approximately one month after the show. Bennett, Tr. (1/26), at 63:21-25.

10.     The first sale of the ATR by Bennett was to Barclay Marine Dist. Corp. in that an order was generated on September 7, 1989. P.T.E. 48.

11.     Pursuant to the marking statute, the ATR and/or literature accompanying same is marked pursuant to Section 287(a) of the Patent Act. D.T.E. 60.

C.     The '780 Patent

12.     On May 19, 1992, United States Patent No. 5,113,780 ("the '780 Patent"), entitled "Automatic boat trim tab control," was issued to Blake J. Bennett and David Hagstrom. P.T.E. 1. The inventors assigned the '780 Patent to Plaintiff Bennett. Accordingly, Bennett is the owner of all right, title and interest in and to the '780 Patent. Joint Pretrial Stipulation, at p. 6  1.

13.     The '780 Patent teaches a way to automatically retract the trim tabs when the boat operator shuts down power to the engine. While trim tab systems were known throughout the marine industry, prior technology encompassed all of these means for adjusting trim tabs but none provided a means for automatic retraction upon removal of power.

14.     Claim 1 of the '780 Patent requires:

A boat having a hull and engine for powering said boat.

Means for selectively applying electrical power to said engine for powering the boat.

Means movably mounted to said hull for trimming attitude of said boat as said hull is propelled through the water.

Means carried by said hull and responsive to a boat operator for selectively adjusting position of

3

A3

said trimming means to maintain desired attitude under varying conditions.

Means coupled to said trimming means and to said engine, and responsive to removal of electrical power from said engine, for automatically moving said trimming means to a predetermined position with respect to said hull upon removal of power at said engine.

P.T.E. 1, col. 3-4.

15.     Claim 3 of the '780 Patent is dependant from claim 1 but further requires:

The system set forth in claim 1 wherein said selectively-positioning means comprises actuator means extending between said hull and said trimming means for moving said trimming means toward and away from said predetermined position, and wherein said automatically-moving means comprises means for applying power to said actuator means for a predetermined time duration following removal of power at said engine sufficient to move said trimming means to said predetermined position independently of position of said trimming means when power is removed from said engine.

P.T.E. 1, col. 4 (emphasis added).

16.     Claim 9 of the '780 Patent requires:

A boat having a hull with a stern and an engine.

At least one trim tab pivotally mounted to said hull at said stern.

An actuator extending between said hull and said tab for selectively moving said tab between fully extended and retracted positions.

Means including a drive responsive to an operator for selectively adjusting position of said trim tab to obtain a desired attitude of said hull.

Means for selectively applying electrical ignition power to said engine for powering said boat.

4

A4

Means coupled to said drive and responsive to removal of electrical power from said engine for operating said actuator for a predetermined time duration so as to move said trim tab to said fully retracted position upon removal of ignition power from said engine.

P.T.E. 1, col. 5-6.

D.    Lenco's ATR System

17.    A box of Lenco Trim Tabs comes standard with trim tab planes, actuators [D.T.E. 9], mounting hardware, and an owner's manual containing installation instructions.  DeVito, Tr. (2/2), at 1084:9-13; Designated 3/29/05 DeVito Depo., at 44.  Lenco customers have the option of purchasing a switch kit for use with the Lenco trim tabs that serves to retract the trim tabs to a fully retracted position when voltage is removed from the orange wire.  Devito, Tr. (2/2), at 1200:4-7; Designated 3/29/05 DeVito Depo., at 44; Designated 3/30/05 DeVito Depo., at 244-245; Martin, Tr. (2/3), at 1401:14-22; 1443:15-1444:5; P.T.E. 92.  Lenco's trim tab system used in conjunction with the retractable switch kit models is referred to collectively herein as the "Lenco ATR" or "Lenco ATR System."

18.    Dave Martin, the engineer who developed the Lenco ATRs, testified that Lenco instructed him to develop a trim tab system that retracted automatically upon removal of power from the orange wire. Martin, Tr. (2/4), at 1515:2-9.

19.    Specifically, the models of Lenco ATRs with retraction capability are all the 123 models and some of the later developed 124 models (124R, 124BNR; 124SSR). Devito, Tr. (2/2), at 1014:18-20; 1017:4-6; 1020:1-12; 1025:5-21; 1062:24-1063:5; Martin, Tr. (2/3), at 1397:7-9, 1428:14-22; Martin, Tr. (2/4), at 1515:11-1516:5.

20.    Lenco's ATR models were originally sold with a set of wiring instructions that instructed

5

the customer to wire the Lenco ATRs to the key switch (or ignition switch) of a boat so that they would automatically retract upon removal of power from the boat's engine. P.T.E. 133. Kleeman, Tr. (2/4), at 1581:23-1582:21; P.T.E. 92.

21.     All the Lenco ATRs have control circuits. D.T.E. 7. All of Lenco ATRs that have been developed since Martin was hired use generally the same electronic control circuitry. Designated Martin Depo., at 64-65; Martin, Tr. (2/4), at 1516:6-1517:25; P.T.E. 86; P.T.E. 180; and P.T.E. 181.

22.     The Lenco control circuit is interchangeable with the control circuit 42 of the '780 Patent. Urban, Tr. (1/28), at 677:11-15; 700:19-701:10.

23.     The individual components of the Lenco control circuit are set forth in detail in P.T.E. 94A. Martin, Tr. (2/4), at 1527:19-1532:20.

24.     Lenco's expert, Mr. McAlexander, stated that it would have been well known by a person of ordinary skill in the art of electronics at the time the '780 Patent was filed, that in order to accomplish the function of responding to the removal of electrical power from the engine, "any number of off the shelf components" could have been selected for use within the control circuit 42 (or black box), including but not limited to a "pulse input" system. McAlexander, Tr. (2/5), at 1808:3-1810:9. Lenco's 123 ATRs uses a pulse input system. Martin, Tr. (2/4), at 1484:12-18.

25.     Moreover, Dave Martin enumerated several different types of electronic control circuitry and agreed that they would all be well known substitutes for the electronic control circuitry in Bennett's patent. Designated Martin Depo., at 45-48, 62-63.

26.     The Lenco 123 ATR Models include indicator switches. Devito, Tr. (2/2), at 1015:19-22; D.T.E. 10.

6

A6

27.     On or about 2006, Lenco modified their model 123 and 124 ATRs so that they could be wired to the tachometer gauge of a boat.  Designated Martin Depo., at 49, 77, 86-88.  A tachometer is a gauge that is hooked up to the engine of the boat and indicates the RPM of the boat's engine.  Devito, Tr. (2/2), at 1200:15-20; Designated Martin Depo., at 49-50; Martin, Tr. (2/4), at 1482:21-24.

28.     In both the old and the new model of Lenco ATRs, the trim tabs can automatically retract upon the removal of power from the engine of a boat.  Designated Martin Depo., at 86-88; Martin, Tr. (2/4), at 1482:21-24.

29.     Lenco currently instructs the purchaser of the tachometer models to wire the control circuit of the ATR to the tachometer, instead of the ignition switch, so that when there is removal of power from the boat's engine, power is removed from the tachometer and it goes to zero, which in turn, removes power to the control circuit, which raises the trim tabs.  Designated Martin Depo., at 50-51; 53-54; Devito, Tr. (2/2), at 1061:23-25; 1203:21-23; Martin, Tr. (2/4), at 1485:1-1488:4.  In this way, the tachometer ATR models still indirectly respond to the stimulus of power being removed from the engine, just as though the ATR were connected directly to the ignition switch. Designated 3/30/05 DeVito Depo., at 276-277; Martin, Tr. (2/4), at 1482:21-24.

30.     Specifically, the tachometer is a gauge whereby turning off the engine causes the tachometer gauge to go to zero, which in turn causes the trim tabs to automatically retract to a full upright position.  Designated Martin Depo., at 50.

31.     Since 2006, Lenco has manufactured, marketed and distributed its trim tab ATR systems with instructions to wire the ATRs directly or indirectly through the ignition switch (or other engine gauge) of a boat so that the trim tabs automatically retract upon removal of power from

7

A7

the boat's engine, which, is an infringement of the '780 Patent.  Kleeman, Tr. (2/4), at 1581:23-1582:21; P.T.E. 133 and 92.  However, as will be explained more fully below, the Court finds that Lenco is not liable for infringement based upon acts taken prior to the execution of the Settlement Agreement between the Bennett and Lenco.  Lenco is liable for post-Settlement Agreement acts of inducing infringement by Rinker, and for its acts of designing, manufacturing and selling the ATRs that are designed to be wired through the tachometer gauge of the boat.

32.     The Lenco ATR System was always capable of being installed in a non-infringing way, so that it is wired to a manual non-engine (or accessory) switch as set forth in Appendix B to P.T.E. 15, such that upon removal of power from the engine, the Lenco trim tabs do not automatically retract.  Martin, Tr. (2/4), at 1501:2-1502:5.

E.      Bennett and Lenco's Past Dealings

33.     Bennett and Lenco are direct competitors.  Blake, Tr. (1/26), at 76:16-21; McGow, Tr. (1/27), at 251:18-20.

34.     Bennett previously accused Lenco of infringing its '780 Patent by letter dated November 9, 2001.  P.T.E. 9.

35.     Mr. Martin admitted that he was hired by Lenco to develop their ATR and to "design around" the '780 Patent.  Designated Martin Depo., at 31-33; 48; Martin, Tr. (2/4), at 1478:17-1481:9.

36.     Mr. Martin testified that DeVito asked him to review the '780 Patent as early as 2000, and that pursuant to his review, Mr. Martin had concerns about whether the Lenco ATR System he developed would fall within the scope of the claims of the '780 Patent.  Martin, Tr. (2/4), at 1470:13-1471:22; 1474:11-21.

8

A8

37      Bennett ultimately entered into a Settlement Agreement with Lenco dated February 25,

2003, wherein Lenco acknowledged the validity and enforceability of the '780 Patent. P.T.E. 15;

DeVito, Tr. (2/2), at 1119:4-8.

F.      The Settlement Agreement

38      While not admitting infringement, Lenco agreed to pay royalties and damages to Bennett

as part of the Settlement Agreement. P.T.E. 15.

39.     Additionally, Lenco also agreed:

(a) to immediately modify all of Lenco's brochures, instruction manuals, pamphlets, cut art,

advertisements, and any other literature or media (collectively "marketing materials" concerning

Lenco's trim tab retractor to refrain from using the words "automatic", "auto tab" or any other

language which suggested that the retractors operated automatically or simultaneously in

connection with or in response to terminating the electrical power to the engine powering the

boat through the engine ignition switch or any other switch or connection which terminates

electrical power to the engine;

(b) that all wiring diagrams and installation instructions for Lenco's trim tab retractor would

include language to ensure that Lenco's trim tab retractor would not be installed in such a way

that the trim tab automatically return to their retracted position upon the termination or removal

of power to the boat's engine;

(c) to notify all of its customers that the Lenco trim tab retractor must no longer be wired or

installed in such a way that the trim tabs automatically return to their fully retracted position

upon termination or removal of power to the boat's engine;

(d) to void any and all warranties to its trim tab system if the trim tab indicator and retractor were

9

A9

wired or installed in such a way that the trim tabs automatically return to their fully retracted

position upon termination or removal of power to the boat's engine and

(e) that it would not advise or counsel any customers to wire Lenco's trim tab retractor in such a

way that the trim tabs automatically return to their fully retracted position upon termination or

removal of power to the boat's engine.

P.T.E. 15.

G.       Sales of Lenco ATRs With Original Wiring Instructions

40.      Pursuant to the Settlement Agreement, Lenco paid Bennett a royalty of $70.00 for 371

ATRs sold by Lenco with the original wiring instructions.  P.T.E. 15.

41.      Lenco warranted to Bennett that Lenco had sold or distributed only 371 Lenco ATRs with

the original wiring instructions that instructed the customer to wire the Lenco ATR to the key

switch (or ignition switch) and Lenco paid Bennett royalties for the 371 ATRs as part of the

Settlement Agreement. P.T.E. 15.

42.      Lenco paid Bennett $25,970 ($70 X 371 = $25,970) pursuant to the Settlement

Agreement.  P.T.E. 15.

43.      Chad Steele, Lenco's Comptroller, was asked to determine the number of units sold from

the inception of the sales of Lenco ATRs shortly after receiving the November 2001 cease and

desist letter. Steele, Tr. (1/29), at 964:25-965:23.

44.      Chad Steele reported that 371 Lenco ATRs had been sold during August 2001 and

December 2001. Steele, Tr. (1/29), at 946:25-947:1; 949:25-950:4.

45.      Thereafter, in February-March 2003, shortly after the Settlement Agreement, Chad Steele,

was tasked with and created a list of the Lenco customers who had purchased the 371 Lenco

ATRs with instructions to wire the ATR through the ignition switch (hereinafter "Customer List") in order to send out copies of the letter attached as Appendix C to the Settlement Agreement to those customers. Steele, Tr. (1/29), at 949:8-4; 950:21-951:2; 973:24-974:1.

46.     According to Richard DeVito the original wiring instructions were replaced "within days" of receiving the November 2001 cease and desist letter.  DeVito, Tr. (2/2), at 1090:6-8.

47.     Sam Mullinax, Vice President of Lenco, testified that he instructed Todd Smith to destroy all of Lenco's original wiring instructions which allegedly infringed the '780 Patent, Mullinax, Tr. (2/3), at 1289:6-14, and that, while unsure of the exact date, all of the wiring instructions were destroyed after receipt of the November 2001 cease and desist letter but before December 28, 2001.  Mullinax, Tr. (2/3), at 1292:13-19; 1304:23-1305:2.

48.     Lenco sent a copy of the letter attached as Appendix C to the Settlement Agreement instructing customers to stop wiring the ATR through the ignition switch to the individuals and companies listed in the Customer List created by Chad Steele.  Steele, Tr. (1/29), at 950:10-25.

49.     Lenco paid Bennett royalties to license the 371 units Lenco warranted had been sold or distributed between August 2001 and December 2001. P.T.E. 15.

50.     With respect to the findings in ¶¶ 41-49, the Court finds the testimony of Lenco's witnesses credible.  Thus, with the exception of paragraph ten of the Settlement Agreement, the Court finds that Lenco complied with its obligations under the Settlement Agreement. The Court further finds that any advertising material that was published after the Settlement Agreement was executed, which were not consistent with Lenco's obligations under the Settlement Agreement, was not done intentionally and were not material breaches of the Agreement. The Court does find, however, that in 2006 Lenco began manufacturing and selling infringing devices which are

designed to be wired through the tachometer gauge, thereby indirectly resulting in the trim tabs retracting upon removal of electrical power from the engine. The Court finds this conduct to constitute patent infringement. The Court also finds that because of the design, manufacture and sale of these devices, which were developed for the specific purpose and intent of trying to circumvent the '780 patent, *and for other reasons discussed more fully below*, Lenco induced infringement by Rinker and others. Therefore, Lenco breached paragraph 10 of the Settlement Agreement. By manufacturing and selling infringing devices, and by inducing infringement of the '780 patent, Lenco has advised and counseled its customers to wire the retraction device in a manner other than as shown in "Appendix B" of the Settlement Agreement.

51.     DeVito was aware that Rinker was wiring their trim tabs directly to the engine switch. Designated 3/29/05 DeVito Depo., at 130-135.   In fact, before 2007, every boat that Rinker built that had the Lenco ATR installed was wired to the ignition switch and automatically retracted upon removal of power from the engine.  Designated Slocum Depo., at 59; Designated Kleeman Depo., at 38; Tr.(1/28) at 729; P.T.E. 92.

52.     Based on eyewitness testimony, Hydra-Sport, Regulator, McKee, Edgewater, Contender, Maverick, Pathfinder, Chapparell, Robalo, all Original Equipment Manufacturers or OEMs (boat builders) and Lenco customers, also wired the Lenco ATR to the boats ignition in a manner that the trim tabs automatically return to their fully retracted position upon termination or removal of power to the boat's engine.  McGow, Tr. (1/27), at 306:3-308:2; 319:1-15;  320:14-21; 322:15-25; 327:10-24; 348:1-12; 349:5-19; 356:14-357:14; 360:17-25; 361:3-9; 368:8-25; 370:11-371:6.

53.     After learning that Lenco's customers were wiring Lenco's ATRs in an infringing way,

Bennett sent out several letters informing them of Bennett's patent rights in an effort to get the customers to stop their infringing activities.  P.T.E. 34, 36, 37, 89 and 90.

54.    After receipt of Bennett's cease and desist letters, concerned customers turned to Lenco for an explanation about Bennett's claims and the '780 Patent.  DeVito, Tr. (2/2), at 1053:20-1054:6; Designated 3/30/05 DeVito Depo., at 255; Designated Campbell Depo., at 56-57.

55.    In response to Bennett's notice to its customers, Lenco proceeded to indemnify at least three of its customers against any claims of infringement by Bennett, namely Rinker, Tige and C&C Manufacturing, so that these customers would not stop buying ATRs from Lenco. DeVito, Tr. (2/2), at 1172:24-1173:5, 1174:11-1177:25, 1190:10-15; 1192:10-12, 1194:8-10, 1195:14-16; Kleeman, Tr. (2/4), at 1573:21-1574:2; 1602:6-19; Designated 3/29/05 DeVito Depo., at 74, 140-141; Designated 3/30/05 DeVito Depo., at 248; Designated 7/1/08 DeVito Depo., at 35, 41-42, 46-47; Designated Burnett Depo., at 76-77; P.T.E. 131; Designated Slocum Depo., at 68; and P.T.E. 113.

56.    DeVito and Lenco also assured the customers that there was "no patent problem," that Bennett's claims were "not that huge of a deal," to not "get uncomfortable with things," and to "not worry."  Slocum, Tr. (1/28), at 725:9-15; Kleeman, Tr. (2/4), at 1573:21-1574:2; 1592:16-1593:17; Designated Campbell Depo., at 57, 59-60, 113-114; Designated Burnett Depo., at 30-31; Designated Austin Depo., at 30.

57.    In fact, Rinker and Slocum specifically relied on these assurances from DeVito when they decided not to change the way they were wiring the Lenco ATR Systems to their boats. Kleeman, Tr. (2/4), at 1598:10-21; 1599:1-9; 1605:11-25; 1607:19-1609:6; Designated Kleeman

13

A13

Depo., at 67.

58.     Slocum testified that he does not even remember receiving a new non-infringing wiring schematic from Lenco, which is another reason Rinker did not stop wiring the Lenco ATR to the ignition switch.  Slocum, Tr. (1/28), at 753:24-754:11.[1]

59.     According to David Kleeman, the purchasing agent for Rinker, DeVito told him that Bennett's complaints and notifications regarding Rinker's patent infringement were "not that huge of a deal" and to not "get uncomfortable with things."  Kleeman, Tr. (2/4), at 1573:21-1574:2. Kleeman also testified that DeVito told him that "Lenco and Bennett [were] in the process of working things out and that [Kleeman] should not concern [himself] with it at this time." Kleeman, Tr. (2/4), at 1593:11-17; see also, Kleeman, Tr. (2/4), at 1604:6-23.

60.     Faced with the threat of a patent infringement suit by Bennett, Slocum admitted he was at a "crossroads" regarding who its trim tabs supplier would be, which gave rise to discussions with Lenco regarding indemnification.  Designated Slocum Depo., at 71-72; Designated 3/30/05 DeVito Depo., at 142; Slocum, Tr. (1/28), at 742:12-15.

61.     In fact, after receiving Bennett's cease and desist letter regarding infringement (P.T.E. 89), Rinker again contacted DeVito and told him they were considering switching to Bennett as their ATR System provider.  But as discussed above, Lenco and DeVito convinced Rinker not to switch from Lenco and agreed to indemnify Rinker so that Rinker did not move its business to Bennett.  Kleeman, Tr. (2/4), at 1605:11-25; 1607:19-1609:6; Designated Kleeman Depo., at 67.

62.     On December 17, 2004, Rinker and Lenco executed an indemnification agreement.

---

[1]  This fact does not alter the Court's finding that Lenco properly *sent* the wiring schematic to Rinker.

P.T.E. 113.

63.    Rinker believed it was protected from suit because Lenco assured Rinker in the

Indemnification Agreement that "[g]oods sold to Rinker as installed by Rinker in accordance

with the original installation instruction sheet, and specifically in reference to the goods as

installed by Rinker in accordance with the original installation instruction sheet, being free of any

encumbrances and any third party claims of infringement." (emphasis added)  Slocum, Tr. (1/28),

at 748:21-749:12.

64.    Since April 2007, Rinker has been wiring Lenco's ATRs to the tachometer (gauge)

instead of the key switch as before, so that upon removal of power from the boat's engine, the

ATR still retracts.   Slocum, Tr. (1/28), at 734:8-12; Kleeman, Tr. (2/4), at 1574:25-1575:3;

1578:19-1579:8; D.T.E. 199.

65.    Thus, Lenco's actions encouraged and induced Rinker, and to the extent Lenco provided

indemnification agreements and sold trim tab systems with instructions to wire them to the

tachometer gauge, others to install and wire Lenco's ATR in a manner that infringes the '780

Patent.

<u>H.      Damages</u>

*Trim Tab Systems*

66.    In 2007, Rinker Boat began wiring Lenco trim tabs systems with the integrated indicator

position display to the boat tachometer as well as to a separate battery switch that would cause

retraction when shut off but leave the engine running. This changeover was completed

throughout the Rinker Boat line by mid-April 2007. (TT 1547:21-1575:3.)

67.    Automatic retraction, however, is not the reason Rinker buys its trim tabs from Lenco

15

rather than Bennett. Automatic retraction is not the feature that drives the sale of the trim tabs. This is best evidenced by the fact that, at least in Florida, only 10% of Bennett's trim tab sales contain the retraction feature. (TT 521-22; 566; 568, Testimony of Stephen Moyer) Rinker uses Lenco's products for reasons unrelated to the retraction feature; namely, electric actuators rather than hydraulic, as well as installation and warranty issues. (TT 1559:24-1560:9; DX170.)

68.      Lost profits is not an appropriate measure of damages for this case. Bennett did not establish the requirements of the "but for" test of Panduit v. Stahlin Bros., 575 F.2d 1152 (6th Cir. 1978) to justify such an award. The Court rejects the testimony of Bennett's damages expert, Alan P. Fiske, and the methodology used by him. The Court finds the testimony of Defendants' expert witness, Robert McSorley, credible on the proper methodology for calculating damages in this case.

69.      Thus, the Court finds that there is no established royalty for the '780 patent as there is no showing of a royalty that is agreed prior to any alleged infringement or was paid by such a number of persons as to indicate a general acceptance of reasonableness. (TT 1873:3.) The Court rejects Bennett's contention that the royalty rate agreed to in the Settlement Agreement is a reasonable royalty rate. The Court concludes that the royalty rate contained in the Settlement Agreement is not a true reflection of a market royalty rate since it was entered into under the treat of litigation.

70.      A reasonable royalty for any infringement by Lenco and Rinker is based on the discounted retail price of the ATR provided by Bennett to OEM boat builders.

71.      Pursuant to the Georgia Pacific factors, a reasonable royalty would be $3/unit or system found to infringe. (DX161; TT 1895:24-1902:19.)

16

A16

*Infringing Units*

72.     In determining the number of infringing units to use as a basis for calculating damages in this case, the Court takes the following approach.  As previously indicated, the Court has found that Lenco properly notified its customers, pursuant to the Settlement Agreement, that the Lenco ATRs could not be wired to an engine switch.  While evidence was presented which demonstrated that a number of Lenco's customers, in some isolated instances, continued to wire the ATR to the engine switch, with the exception of Rinker, there was insufficient evidence to demonstrate that such acts were a result of any act or failure to act on the part of Lenco.  The Court cannot speculate that because a few Lenco customers' trim tabs were wired to the ignition switch, they all were.  Nor can the Court speculate that because Lenco provided indemnification agreements to some of its customers, those customers continued to wire all of the Lenco trim tabs to the ignition switch.   There simply was insufficient evidence for the Court to make any quantification of infringing sales to customers other than Rinker.  Therefore, excepting sales to Rinker, Lenco ATR sales which occurred before Lenco began selling ATRs to be wired to the tachometer gauge will not be considered infringing sales.

        The Court will, however, consider all sales by Lenco of its ATR that were designed to be wired through the tachometer gauge, since the Court is finding that such sales are infringing and an inducement to others to infringe.

        Moreover, unlike Lenco's other customers, there is sufficient evidence in this record to hold Lenco liable for all of the sales made to Rinker.  As previously indicated, the record demonstrates before 2007, every boat Rinker built that had the Lenco ATR installed was wired to the ignition switch and automatically retracted upon removal of power from the engine.  Thus, all

17

A17

sales to Rinker, both before and after the ATR designed to be wired to the tachometer gauge, will

be considered in the damage calculation.

73.     The majority of Lenco trim tabs have been sold including a Lenco ATR. Richard DeVito

testified that all but maybe 100 units of Lenco trim tabs were sold by Lenco including an

indicator.  Designated 3/30/05 DeVito Depo., at 295:15-296:3.

74.     Lenco sold 7,846 ATRs to Rinker through the time of trial.  P.T.E. 184 p. 15.[2]

75.     Lenco sold 35,271 ATR's designed to be wired to the tachometer gauge through the time

of trial. Defendants' Exhibit 218.[3]

I.      Defendants' Invalidity Defense - Alleged On Sale Bar and Printed Publication

76.     Defendants' main defense to Bennett's claims of inducement and direct patent

infringement rests on their assertion that letters with an alleged attached brochure, dated

approximately two weeks before the critical date, were mailed to Bennett's customers by

Bennett's former sales representative, Nelson Wilner ("Wilner"), and that such alleged

dissemination was an offer for sale or printed publication pursuant to 35 U.S.C. §102(b)

---

[2]  The Court relied upon Bennett's expert report that indicated Rinker purchased a total of 7,006
Lenco retraction devices between October of 2002 and May of 2008.  Over the course of the
relationship, Rinker purchased on average 105 retraction devices per month from Lenco.  The
Court then imputed 840 additional units from May of 2008 to the date of trial.

[3]  David Martin testified that Lenco developed the product designed to be wired to the
tachometer gauge in late 2005, early 2006.  Designations from David Martin Deposition at 49.
The Court accepts the sales figures contained in Defendant's Exhibit 218, which included sales
up to February 29, 2008, as the best evidence of Lenco's total sales after the development of the
tachometer wiring product.  The Court used the sales figures from that exhibit for the years 2006,
2007 and up to February, 2008. The Court then imputed an additional 12,406 product sales from
February 29, 2008 through the date of the trial.  The Court used the five month total of 5,169 for
the period of October 1, 2007 through February 29, 2008 as the basis to impute the additional
sales through the date of trial.

(hereinafter referred to as the "Wilner Form Letters").   D.T.E. 29.

77.     At the top, the Wilner Form Letters state in all capital letters: "BENNETT MARINE

NEW PRODUCT ANNOUNCEMENT."

78.     The Wilner Form Letters are not addressed to a recipient.

79.     Nelson Wilner testified that he "did not remember" the date he wrote the Wilner Form

Letters or the date the Wilner Form Letters were sent out.  Designated 6/20/05 Wilner Depo., at

80; Designated 9/16/08 Wilner Depo., at 60.

81.     When asked if the two slightly different drafts of the Wilner Letter were sent to

international customers and customers within the United States, Wilner replied that although it is

possible, it is not probable, and that if he was to "speculate" P.T.E. 140 may have gone to

Bennett's sales representatives and P.T.E. 27 may have gone to international customers outside

the U.S.  Designated 9/16/08 Wilner Depo, at 28.  When asked whether he could say definitively

that he did not send the Wilner Form Letters to customers within the U.S. he replied,

"definitively, no, but likely not."  Designated 9/16/05 Wilner Depo, at 29.

82.     Blake Bennett testified that no customer letters or product announcements were ever sent

out unless they were printed on Bennett letterhead.  Bennett, Tr. (1/26), at 72:21-73:6.

83.     The Wilner Form Letter drafts were not on Bennett letterhead.  P.T.E 140 and P.T.E. 27.

84.     Defendants did not introduce any evidence at trial that the Wilner Form Letters were ever

received by anyone.

85.     Defendants also argue that Bennett's purchase of a few circuit boards from third party

Accutronics amounted to an invalidating "sale" of the patented invention.  Accutronics is a third

party company the inventor David Hagstrom hired to build circuit boards while designing the

19

circuitry disclosed in Fig. 2 of the '780 Patent.  Designated 4/7/05 Hagstrom Depo., at 122.

J.      Defendants' Invalidity Defense of Anticipation Pursuant to 35 U.S.C. 102

86.     Defendants also assert that the '780 Patent is invalid because it is anticipated or rendered

obvious by alleged prior art.  Specifically, Defendants contend that Claims 1 and 9 of the '780

Patent are anticipated by U.S. Patent No. 4,872,857 to Newman ("the Newman Patent"),  D.T.E.

127, U.S. Patent No. 4,762,079 to Takeuchi ("Takeuchi I Patent"), D.T.E. 140, and U.S. Patent

No. 4.908,766 to Takeuchi ("Takeuchi II Patent"), D.T.E. 143.

87.     The Newman patent entitled "OPERATION OPTIMIZING SYSTEM FOR A MARINE

DRIVE UNIT" describes a system for optimizing the operation of a marine drive of the type

whose position may be varied with respect to the boat by the operation of separate lift and

trim/tilt means and includes an automatic control system which stores preselected drive positions

for various operating modes and is operative to return the drive unit to any pre-established

position by pressing a selected operating mode positioning button. D.T.E. 127.

88.     The "drive unit" pictured in this patent is a marine, internal combustion outboard engine

mounted on an adjustable mounting bracket attached to the stern of the boat.  The patent

describes a semi-automated method for moving the outboard engine around depending on if the

boat is accelerating, cruising, slowly trolling, or riding on a trailer in response to the boat

operator pressing a button.  D.T.E. 127.

89.     The Newman patent discloses a control system that stores preselected drive positions of

boat outboard motors for various operating modes and is operative to return the drive unit to any

pre-established position by the boat operator physically pressing a selected operating mode

positioning button.  For reasons of performance and safety, the '857 patent explains that the

20

A20

control system in the '857 patent uses a signal from a speed sensor, which senses when the engine

speed (RPM) is zero, so that movement to the trailering position (engine up position) button will

be inoperative (or locked) unless the boat's engine speed is zero.  Only at that point, can the boat

operator raise the motor to the trailering position by pressing a button.  D.T.E. 127.

90.    Bennett's expert, Dr. Urban, testified that the Newman Patent does not anticipate the '780

patent due to the fact that it is missing several elements claimed in the '780 Patent.  Specifically,

Dr. Urban testified that the Newman Patent does disclose any trim tabs, which are described and

claimed in the '780 patent, and it does not have any automatic retraction on removal of power

from the engine.  Urban, Tr. (1/28), at 603:2-13.

91.    The Newman Patent does not disclose a trim tab, but a "cavitation plate," and the two are

not synonymous. Urban, Tr. (1/28), at 603:24-605:22.

92.    Moreover, during cross-examination, Mr. McAlexander conceded that the phrases

"cavitation plate" and "trim tabs" are not referenced anywhere in the Newman patent

[McAlexander, Tr. (2/5), at 1828:13-19], and that Mr. McAlexander relied on extrinsic evidence

to support his assertion that the cavitation plate is a "trim tab" required by Claim 1 and Claim 9

of the '780 Patent. McAlexander, Tr. (2/5), at 1835:11-22.

93.    Dr. Urban also testified that the Newman Patent did not disclose or describe automatic

retraction upon removal of power from the engine.  Urban, Tr. (1/28), at 603:4-13.  In fact, Mr.

McAlexander admitted during cross examination that the Newman Patent required a boat

operator to physically press a button in order to return the drive unit to any pre-established

position. Tr. (2/5) 1832:6-10; 1834: 7-13 (emphasis added).

94.    The Takeuchi I Patent entitled "TRIM TAB ACTUATOR FOR MARINE PROPULSION

21

A21

DEVICE" to Takeuchi ("Takeuchi patent"), D.T.E. 140, describes a trim tab actuator for a marine

propulsion device wherein a plurality of watercraft running conditions are sensed and an

outboard motor with a trim tab attached is automatically positioned so as to maintain the

watercraft in its present course as dictated by the measured preset condition.

95.    Similarly, the Takeuchi II Patent entitled "Trim Tab Actuator For Marine Propulsion

Device", D.T.E. 143, also discloses a trim tab that has to do with a steering effort and the steering

of a boat.  Urban, Tr. (1/28) 608:1-12.

96.    The trim tabs mentioned in the Takeuchi Patents are not the same trim tabs referenced in

the '780 Patent.  The trim tabs mentioned in the Takeuchi Patents deal with the steering and

course correction of an outboard engine on a power boat, whereas the trim tabs in the '780 Patent

deal with trim tabs that are attached to the stern of a power boat that are designed to correct the

attitude, pitch, and roll of a power boat.  D.T.E. 140 and 143; Urban, Tr. (1/28), at

604:13-605:22, 607:17-609:6.

97.    In fact, the cavitation plate and the trim tabs set forth in the Newman and Takeuchi

Patents do not have a "retract" position because they rotate side to side or horizontally.  Urban,

Tr. (1/28), at 610:22.

98.    Neither of the Takeuchi Patents disclose automatic retraction upon removal of power

from the engine.  Urban, Tr. (1/28), at 609:13-22.

K.    Defendants' Invalidity Defense of Obviousness Pursuant to 35 U.S.C. 103

99.    Of the patents that Defendants had admitted into evidence, namely, the '278 patent, the

'323 patent, the '487 patent, the '204 patent, the '320 patent, the '741 patent, and the '794 patents

(hereinafter, the "Trim Tab Patents") all are prior art patents that disclose different types of trim

tab actuators and outboard motor trimming systems.

100.    The '278 patent entitled "BOAT LEVELER MECHANISM PISTON CONSTRUCTION"
describes a piston construction for moving trim tabs mounted to the stern of a boat.  This patent
is by the same inventor for the' 323 patent.  D.T.E. 130.

101.    The '487 patent entitled "HYDRAULICALLY OPERATED TRIM ATTACHMENT
FOR POWERBOATS" describes a kind of hydraulic cylinder with no extra hydraulic lines and
has features to control volume and pressure.  D.T.E. 126.

102.    The '204 patent entitled "POWER BOAT WITH TRIM TABS" describes a kind of
control actuator with a single actuating switch.  D.T.E. 125.

103.    The '794 patent entitled "TRIM TAB INDICATOR SYSTEM" describes a way of sensing
and displaying the position of each of two trim tabs attached to the stern of a boat. D.T.E. 138.

104.    The '741 patent entitled "TRIM TAB POSITION MONITOR AND DISPLAY DEVICE"
describes an electronic position monitor and readout device for trim tabs on boats in which the
monitor and readout device are connected to the trim tab controls.  This patent relates generally
to the art of monitoring and displaying trim tab information and not to controlling trim tabs.
D.T.E. 135.

105.    The '320 patent entitled "ELECTRICAL CONTROL FOR TRIM/TILT OF DUAL
OUTBOARD OR STERN DRIVES" describes an electrical control system for a pair of stern
drives (or outboard motors) mounted side-by-side on a boat transom.  This patent has to do with
controlling the up and down axis of the propeller thrust of a pair of marine engines.  D.T.E. 128.

106.    The '278 patent and the '204 patent were considered by the Patent Examiner during the
prosecution of the '780 Patent.  D.T.E. 3.

**II.    CONCLUSIONS OF LAW**

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) and

supplemental jurisdiction over the breach of settlement and unfair competition claims pursuant to

28 U.S.C. § 1367.  Complaint, 7; Lenco's Answer, 7.

2.      This Court has personal jurisdiction over Lenco and DeVito in that both are residents of

South Florida.  Complaint, 8; Lenco's Answer, 8.  This Court has personal jurisdiction over

Rinker in that Rinker conducts business in Florida by making sales of boats that have been

shipped to the State of Florida and from time to time employees of Rinker have traveled to the

State of Florida to attend trade shows.  Complaint, 9; Rinker's Answer, 9.  The Court also finds

that it has personal jurisdiction over Slocum.

3.      Venue as to Lenco is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28

U.S.C. § 1400(b) in that Lenco resides in this District.  Complaint, 12; Lenco's Answer, 12.

4.      Venue is proper in this District as to Richard DeVito pursuant to 28 U.S.C. § 1391(b) and

28 U.S.C. § 1400(b) in that Richard DeVito resides in this District.  Complaint, 12; DeVito's

Answer, 12.  Venue is also proper against Slocum in this District pursuant to 28 U.S.C. §

1391(b) and 28 U.S.C. § 1400(b)

A.      Patent Infringement

5.      A patent infringement analysis is a two step process.  First the court must construe as a

matter of law the claim terms at issue.  North American Container, Inc. v. Pastipak Packaging,

Inc., 415 F.3d 1335, 1344 (Fed. Cir. 2005).  Second, the Court must compare the allegedly

infringing device to the claim terms as construed.  Markman v. Westlaw Instruments, Inc., 52

F.2d 967, 976 (Fed. Cir. 1995); Amster Corp v. Envirotech Corp., 730 F.2d 1476, 1481 (Fed. Cir.

1984).

6.      Both the Supreme Court and this Court must adhere to the fundamental principle that claims define the scope of patent protection. See, e.g., Aro Mfg. v. Convertible Top Replacement Co., 365 U.S. 336, 339 (1961) ("[T]he claims made in the patent are the sole measure of the grant...."); Cont'l Paper Bag Co. v. E. Paper Bag Co., 210 U.S. 405, 419  (1908) ("[T]he claims measure the invention."); Atl. Thermoplastics Co. v. Faytex Corp., 974 F.2d 1299, 1300 (Fed. Cir.1992) ("The claims alone define the patent right."); SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 (Fed. Cir.1985) ("It is the claims that measure the invention."). The claims thus give notice of the scope of patent protection. See, e.g., Mahn v. Harwood, 112 U.S. 354, 361 (1884) ("The public is notified and informed by the most solemn act on the part of the patentee, that his claim to invention is for such and such an element or combination, and for nothing more."). The claims give notice both to the examiner at the U.S. Patent and Trademark Office during prosecution, and to the public at large, including potential competitors, after the patent has issued.

7.      Moreover, the law of infringement compares the accused product with the claims as construed by the court.  Infringement, either literally or under the doctrine of equivalents, does not arise by comparing the accused product "with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee." SRI Int'l, 775 F.2d at 1121.

8.      Accordingly, Defendants' attempts to avoid infringement by comparing the Lenco ATR System to the Bennett ATR System must fail.

25

## 1. Claim Interpretation

9.      By Opinion and Order dated May 30, 2007 (hereinafter "Claim Construction Order"), this

Court construed the claims of the '780 Patent.

10.     On January 22, 2009, the Court reaffirmed its Claim Construction Order.

The Court's Interpretation of Claim 1 of the '780 Patent

11.     Claim 1 of the '780 Patent reads:

A boat trim control system that comprises:

        a boat having a hull and an engine for powering said boat;

        means for selectively applying electrical power to said engine for powering the

        boat;

        means movably mounted to said hull for trimming attitude of said boat as said

        hull is propelled through the water;

        means carried by said hull and responsive to a boat operator for selectively

        adjusting position of said trimming means to maintain desired attitude under

        varying conditions, and

        means coupled to said trimming means and to said engine, and responsive to

        removal of electrical power from said engine, for automatically moving said

        trimming means to a predetermined position with respect to said hull upon

        removal of power at said engine.


12.     As set forth in its Claim Construction Order, the Court construed the first element of

Claim 1, namely "A boat having a hull and an engine for powering said boat consistent with the

ordinary meaning of the terms. A person with ordinary skill in the art understands the meaning of the terms. The Court noted, however, that the engine described in this element is for powering the boat through water. (Specification, col. 1, line 50.).

13.     The Court interpreted the second element of Claim 1, namely, means for selectively applying electrical power to said engine for powering the boat as a means plus function terms. The function is to allow the operator to choose whether electrical power to the engine that runs the boat is on or off. The structure is a switch which turns the electrical power to the boat's engine on and off, and equivalents thereof.

14.     The Court interpreted the third element of Claim 1, namely, means movably mounted to said hull for trimming attitude of said boat as said hull is propelled through the water as a stated in means plus function terms. The function is to provide a means for maintaining the attitude of the boat. The structure is a trim tab or trim tabs and equivalents thereof.

15.     The Court interpreted the fourth element of Claim 1, namely, means carried by said hull and responsive to a boat operator for selectively adjusting position of said trimming means to maintain desired attitude under varying conditions as a means plus function terms.  The function is to allow the boat operator to move and change the angle of the trim tabs from whatever position the tabs are in to the operator's choice of position so that a desired attitude is obtained. The structure includes "operator switch 40" that is "coupled to battery 38 for selectively applying electrical control signals to motor 30 and valves 32, 34 which supply pressure to actuators 24 and 26 for adjusting the position of the trim tabs 12, 14 independently of each other" or equivalents thereof.

16.     The Court rejected Defendants' assertion that the structure for the fourth element of Claim

27

A27

1 is limited to hydraulic trim tab adjustment mechanisms.  First, the specification expressly states: "It will be appreciated, of course, that the principles of the invention apply to electrical or pneumatic actuators of trim tabs, in addition to the preferred hydraulic implementation."  '780 Patent Col. 3:53-56.  Furthermore, dependent claim 4 provides that the system includes "a fluid actuator." Because the limitation of "fluid actuator" is present in a dependent claim, independent Claim 1 should be read as broader than the dependent claim.

17.    The Court observes that the terms "valves" and "pressure" are generally used only in connection with hydraulic and perhaps pneumatic actuator systems.  Such terms are not used with electrical, mechanical, or other types of actuators that do not rely upon "valves" or "pressure" for their operation.

18.    After listening to Urban and McAlexander's testimony, the Court further concludes that a person of ordinary skill in the art of electric actuators, which were well known in the art at the time the '780 Patent was filed and disclosed in the patent specification, would know that if they implemented the claimed system with an electrical actuator instead of a hydraulic actuator, they could eliminate the pumps and valves.  See McAlexander, Tr. (2/5), 1751:11-1752:11.

19.    Accordingly, the Court reaffirms its Claim Construction Order with the clarification that Claim 1of the '780 Patent applies equally to electrical actuators as hydraulic actuators and the inclusion of the "valve" and "pump" elements in this claim limitation are unnecessary.

20.    The Court interpreted the fifth element of Claim 1, namely, means coupled to said trimming means and to said engine, and responsive to removal of electrical power from said engine, for automatically moving said trimming means to a predetermined position with respect to said hull upon removal of power at said engine as a  means plus function terms. The function

A28

is to provide a means to respond to the stimulus of electrical power being removed from the engine, thus resulting in the trim tabs being automatically returned to the fully retracted position or other predetermined position. ('780 Patent, Col: 55-59.) The structure is the control circuit 42, fig. 1, and equivalents thereof.

21.    The Court rejected Defendant's attempt to describe the control circuit structure by way of listing all the component parts. As the Court stated in Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1268 (Fed. Cir. 1999), a claim limitation written in means plus function form "is literally met by structure, materials, or acts in the accused device that perform the claimed function in substantially the same way to achieve substantially the same result. The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function. This is why structures with different numbers of parts may still be equivalent under § 112, P 6, thereby meeting the claim limitation. . . the relevant structure is that which 'corresponds' to the claimed function. . . further deconstruction or parsing is incorrect."

The Court's Interpretation of Claim 9 of the '780 Patent

22.    Claim 9 of the '780 Patent reads:

A boat trim control system that comprises

a boat having a hull with a stern and an engine

at least one trim tab pivotally mounted to said hull at said stem

an actuator extending between said hull and said tab for selectively moving said tab

between fully extended and retracted positions

means including a drive responsive to an operator for selectively adjusting position of

29

A29

said trim tab to obtain a desired attitude of said hull

means for selectively applying electrical ignition power to said engine for powering said boat

means coupled to said drive and responsive to removal of electrical power from said engine for operating said actuator for a predetermined time duration so as to move said trim tab to said fully retracted position upon removal of ignition power from said engine.

23.     The Court construed elements one, two and three consistent with the ordinary meaning of the terms set forth therein. Thus, a person with ordinary skill in the art understands the meaning of the terms boat, hull, stem, engine, trim tab and actuator.

24.     The Court construed the fourth element of Claim 9 of the '780 Patent, namely, means including a drive responsive to an operator for selectively adjusting position of said trim tab to obtain a desired attitude of said hull as a means plus function terms. The function is to allow the boat operator to move and change the angle of the trim tabs from whatever position the tabs are in to the operator's choice of position so that a desired attitude is obtained. The structure includes "operator switch 40" that is "coupled to battery 38 for selectively applying electrical control signals to motor 30 and valves 32, 34 which supply pressure to actuators 24 and 26 for adjusting the position of the trim tabs 12, 14 independently of each other" or equivalents thereof.

25.     As stated above with Claim 1, it is commonly known by those of ordinary skill in the art that "pumps" and "valves" are not used with electrical actuator systems.  Accordingly, the inclusion of the "valve" and "pump" elements in this claim limitation are unnecessary.

26.     The Court construed the fifth element of Claim 9 of the '780 Patent, namely, means for selectively applying electrical ignition power to said engine for powering said boat as a means

30

A30

plus function term. The function is to supply electrical ignition power to the engine. The structure is "switch," which turns the electrical power to the boat's engine on and off and equivalent thereof.

27.    The Court construed the sixth element of Claim 9 of the '780 Patent, namely, means coupled to said drive and responsive to removal of electrical power from said engine for operating said actuator for a predetermined time duration so as to move said trim tab to said fully retracted position upon removal of ignition power from said engine as a means plus function terms. The function is to provide a means to respond to the stimulus of electrical power being removed for a predetermined time from the engine, thus resulting in the trim tabs being moved to their fully retracted positions. The structure is control circuit 42, fig. 1, and any equivalents thereof.

### 2. Literal Infringement of Claim 1 of the '780 Patent by Rinker

28.    In order for a device to literally infringe a claim, each and every element of the patent claim must be found in the accused device.  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995); Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520  U.S.  17, 41 (1997).  The burden to show literal infringement is on the patentee by a preponderance of evidence.  Braun Inc., v. Dynamics Corp., 975 F.2d 815 (Fed. Cir. 1992).

29.    As stated above, the Lenco ATR system consists of trim tabs, trim tab actuators, a control box containing control circuitry and an operator switch (either with indication or without indication) and Rinker installs Lenco ATR systems on its power boats.

30.    Defendants' main non-infringement arguments at trial were in essence an attempt to re-argue claim construction.  Specifically, Defendants argue, that elements four and five of Claim

31

A31

1 of the '780 Patent do not read on Rinker's installations of Lenco's ATRs because: (1) Lenco's ATR is based on an electrical system, not a hydraulic system; (2) Lenco's ATR uses a different control circuit which is made up of different components than the control circuit that Defendants contend is claimed in the fifth limitation of Claim 1 of the '780 Patent; (3) Element 5 of Claim 1 of the '780 Patent requires a control circuit that includes a timing mechanism, which mechanism Defendants contend is not included in Lenco's ATR; and (4) Lenco's current ATR which they began selling to Rinker on or about 2007, is not wired directly to the ignition switch, which Defendants contend is required by the fifth limitation of Claim 1 of the '780 Patent.

31.    The Court shall address each of Defendants' arguments of non-infringement in turn with respect to literal infringement of Claim 1 of the '780 Patent.

    Electrical v. Hydraulic Trim Tab Systems

32.    As set forth above, because the patent specification and Claim 1 of the '780 Patent is not limited to hydraulic trim tab systems, thereby including electrical and/or pneumatic trim tab systems, Defendants' first argument fails.  Lenco did not invent electromechanical actuators and they had been in use for decades before the '780 Patent was filed.  Martin, Tr. (2/3), at 1435:6-10. Accordingly, electrical trim tab systems are well within the scope of Claim 1 of the '780 Patent as set forth in this Court's Claim Construction Order.

    The Lenco ATR Control Circuit

33.    Defendants' argue that Rinker's installations of Lenco's ATRs cannot infringe the '780 Patent because Lenco uses a different control circuit than the control circuit claimed in the '780 Patent.  Simply put, Defendants are once again arguing claim construction that the components or electrical circuitry inside Lenco's control circuits should be compared to the individual

components of the control circuit described in Fig. 2 of the '780 Patent's preferred embodiment, in order to find direct infringement.

34.    This Court has previously denied this argument in its Markman Order. As stated many times by the Federal Circuit:

> The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations.  Rather the claim limitation is the overall structure corresponding to the claimed function. The appropriate degree of specificity is provided by the statute itself; the relevant structure is that which 'corresponds' to the claimed function.  Further deconstruction or parsing is incorrect.

Odetics, 185 F.3d at 1268 (citing Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc., 145 F.3d 1303, 1308-09 (Fed. Cir. 1998) ("structure 'unrelated to recited function' disclosed in the patent is irrelevant to §112, 6"); Valmont Industries, Inc. v. Reinke Mfg. Co., 983 F.2d 1039, 1044 (Fed. Cir. 1993) (identifying structure referring to the claimed function).

35.    As set forth above, the overall structure identified by this Court in its interpretation of Claim 1, is the control circuit 42, fig. 1, not the control circuit depicted in fig. 2.  Therefore, under this Court's claim construction, Lenco's ATR need only include the structure of a control circuit as depicted in fig. 1 of the '780 Patent which performs the function of "provid[ing] a means to respond to the stimulus of electrical power being removed from the engine, thus resulting in the trim tabs being automatically returned to the fully retracted position or other predetermined position" in order to directly infringe the '780 Patent.

36.    Similarly, Defendants argue that in order to infringe Claim 1 of the '780 Patent, that Lenco's ATR must include a control circuit structure that operates using a timing mechanism.

However, the claims set forth in the '780 Patent do not even refer to a "time" requirement until dependant claim 3.  P.T.E. 1, col. 4, lns. 21-31.

37.     In fact, claim 3 is required by the doctrine of claim differentiation to be narrower in scope than claim 1.  Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) (recognizing presumption that each patent claim has a different scope from every other claim); Specialty Composites v. Cabot Corp., 845 F.2d 918, 988 (Fed. Cir. 1988) (independent claims are necessarily broader than their dependant claims).

38.     Accordingly, Claim 1 of the '780 Patent does not require a control circuit structure that operates using a timing mechanism.

Direct v. Indirect Wiring of the Lenco ATR

39.     Lastly, Defendants claim that in order to infringe Claim 1 of the '780 Patent, that the Lenco ATR must be directly wired to the ignition switch.  Notwithstanding the fact that, as set forth above, Rinker and other Lenco customers, wired Lenco's ATR System directly to the ignition switch for years, this Court has determined as a matter of law that the means plus function element 5 of claim 1 of the '780 Patent covered the "control circuit 42" structure with the required function of "responding to the stimulus of electrical power being removed from the engine."

40.     It is important to note that it was only in 2007 that Rinker began urging its customers to wire Lenco ATRs to the tachometer gauge of their boats instead of directly to the ignition. Designated Martin Depo., at 50-51; 53-54; DeVito, Tr. (2/2), at 1061:23-25; 1203:21-23.

41.     Dave Martin, the Lenco engineer who worked on the new tachometer ATR model for Lenco, testified that this new system was developed as a way to "design around" the existing

A34

Lenco retractable trim tab systems from the '780 Patent.  Designated Martin Depo., at 52-53.

42.    This attempted "design around" added an additional element, a tachometer, to the old

Lenco models. Designated Martin Depo., at 52-53.  Instead of wiring the control circuit directly

to the ignition, Lenco now instructs that the ATRs control circuit be wired to the tachometer

gauge of the boat, so that when there is removal of power from the boat's engine, power is

removed from the tachometer and it goes to zero, which in turn, removes power to the control

circuit which raises the trim tabs.  Designated Martin Depo., at 50-51, 53-54.  However, adding

an element to an infringing device does not preclude infringement, as long as every element

recited in the claim still appears in the alleged infringing system. It matters not that the infringing

system has elements or steps in addition to the ones specified by the claim.  It infringes because it

has everything for which the claim calls. Carl Zeiss Stiftung v. Renishaw PLC, 945 F.2d 1173

(Fed. Cir. 1991).

43.    Accordingly, Lenco's new tachometer model still has a "control circuit" that is

"responsive to the stimulus of electrical power being removed from the engine."  Designated

Martin Depo., at 50-51, 53-54.  In this new Lenco tachometer model, the control circuit is

programmed so that when the boat engine loses power, the tachometer gauge goes to zero, which

in turn causes the trim tabs retract automatically.  Id.  In fact, DeVito even admitted at his 2005

deposition that hooking the Lenco ATRs to a gauge on the boat would be in contravention of the

terms of the Settlement Agreement he executed with Bennett regarding the '780 Patent.

Designated 3/30/05 DeVito Depo., at 277.

44.    Just because the new tachometer ATR model is not physically wired directly to the

ignition switch, does not mean that it does not still perform the identical function of the means

plus function claim element as construed by the Court, namely, it still "responds to the stimulus of electrical power being removed from the engine," which is all that is required to find literal infringement.

45.    Accordingly, this Court finds that Lenco's ATR, when installed directly to the ignition switch, literally infringes Claim 1 of the '780 Patent.  This Court also finds that installation of Lenco's ATR to the tachometer, which is an indirect connection to the ignition switch, also constitutes a direct infringement of the '780 Patent.

46.    In sum, Lenco's ATR installed by Rinker, satisfies every claim limitation set forth in Claim 1 of the '780 Patent.

            Literal Infringement of Claim 9 of the '780 Patent by Rinker

47.    As with Claim 1 above, Lenco's trim tab systems installed on the stern of a boat hull with an engine would satisfy these first three limitations of Claim 9.  Thus, Rinker's installation of the Lenco ATR on Rinker's boats meets elements 1 thru 3 of Claim 9 of the '780 Patent.

48.    The Lenco trim tab systems also satisfies element 4 of Claim 9 because they use electrical actuators and both model 123 and 124 include operator switches that are to be coupled to a battery in order to adjust the position of the trim tabs.  Specifically, model 123 includes an indicator switch and model 124 includes a standard tactile switch.

49.    With respect to element 5 of Claim 9 of the '780 Patent, this Court finds this element present where it is not in dispute that Rinker's boats have switches which turn the electrical power to the boat's engine on and off.

50.    Lastly, as discussed above with regard to Claim 1, element 5, this Court finds the last element of Claim 9 of the '780 Patent to be present in the Lenco ATR, namely Lenco's ATR

includes a control circuit 42, as set forth in fig. 1 of the '780 patent.

51.     Accordingly, the Court finds that Lenco's trim tab systems both meet each and every element of claim 9 of the '780 Patent literally.

   3. Doctrine of Equivalents

52.     Infringement under the Doctrine of Equivalents still may be found where those limitations of a claim not found exactly in the accused device are met by an equivalent structure. Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931 (Fed. Cir. 1987), cert. denied, 485 U.S. 961 (1988). Infringement under the doctrine of equivalents is an intensely factual inquiry. Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc., 212 F.3d 1377, 1381 (Fed. Cir. 2000). For a finding of infringement under the doctrine of equivalents, the limitations of the claim must be compared to the elements of the infringing piece. See Warner-Jenkinson Co., 520 U.S. at 40, 41.

53.     The determination of infringement can be based on the application of the tripartite function-way-result test. Id. To utilize this test, "an accused product is equivalent to a claimed element if the accused element performs substantially the same function in substantially the same way to accomplish the same result as the claimed element." Graver Tank & Mfg. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950).

54.     However, the Federal Circuit has acknowledged that a finding of infringement under the doctrine of equivalents is not solely restricted to the tripartite test. See Hilton Davis Chem. Co. v. Warner-Jenkinson Co., 62 F.3d 1512, 1518 (Fed. Cir. 1995) (en banc) (per curiam), cert. granted, 516 U.S. 1145 (1996). Rather, objective evidence such as "known interchangeability to one of ordinary skill in the art, copying, and designing around" may be used in the determination as to whether the differences between the patent and the accused product are insubstantial. Texas

Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1566 (Fed. Cir. 1996) (quoting

Hilton Davis Chem. Co., 62 F.3d at 1518).

55.     Equivalent structure literally infringes means-plus-function patent claims if it performs

identical function in substantially same way with substantially same result; it infringes under

doctrine of equivalents if it performs substantially same function in substantially same way to

achieve substantially same result. 35 U.S.C.A. § 112, par. 6; see also Kemco Sales, Inc. v.

Control Papers Co., Inc., 208 F.3d 1352 (Fed. Cir. 2000) ("If an accused structure is not a 35

U.S.C. section 112, paragraph 6 equivalent of the disclosed structure because it does not perform

the identical function of that disclosed structure and hence does not literally infringe, it may

nevertheless still be an 'equivalent' under the doctrine of equivalents. Thus, if one applies the

traditional function-way-result test, the accused structure must perform substantially the same

function, in substantially the same way, to achieve substantially the same result, as the disclosed

structure." (footnotes omitted)).

56.     The installation of Lenco's ATRs infringe the '780 Patent, if not literally, then under the

doctrine of equivalents.  The Lenco control circuit is interchangeable with the control circuit 42

of the '780 Patent.  Urban, Tr. (1/28), at 677:11-15; 700:19-701:10.

57.     In fact, Lenco's expert, Mr. McAlexander, admitted that it would have been well known

by a person of ordinary skill in the art of electronics at the time the '780 Patent was filed, that in

order to accomplish the function of responding to the removal of electrical power from the

engine, "any number of off the shelf components" could have been selected for use within the

control circuit 42 (or black box), including but not limited to a "pulse input" system.

McAlexander, Tr. (2/5), at 1808:3-1810:9.  Lenco's 123 ATRs uses a pulse input system.  Martin,

38

A38

Tr. (2/4), at 1484:12-18.

58.    Moreover, Dave Martin enumerated several different types of electronic control circuitry and agreed that they would all be well known substitutes for the electronic control circuitry in Bennett's patent.  Designated Martin Depo., at 45-48, 62-63.

59.    Thus, Defendants' own expert and engineer concede that a pulse system or other circuits equally well known to electrical engineers at the time the '780 Patent was filed, could be used interchangeably to accomplish the claimed function of the control circuit 42, as identified by this Court above, namely to "provide a means responsive to the stimulus of electrical power being removed from the engine."

60.    Therefore, the Court finds that the control circuitry in Lenco ATR is interchangeable with the control circuit 42, fig. 1 of the '780 Patent.

61.    Accordingly, Lenco's ATR control circuits and the control circuit 42 of the '780 Patent are at least equivalent structures for purposes of infringement.

        4. Invalidity Defenses

62.    Defendants raised a number of invalidity defenses.  When considering invalidity a determination is made from the perspective of one of ordinary skill in the art.  Scripps Clinic & Research Found. V. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991); International Co. v. Teleflex Inc., 127 S. Ct. 1727, 1742 (2007) (emphasizing that, in determining whether a patent combining known elements would have been obvious, the focal question is whether the combination was obvious to a person with ordinary skill in the art).

Ordinary Skill in the Art

63.    The person of ordinary skill in the art is a hypothetical person, and is presumed to have

read and understood publicly available literature in the relevant technical area.

64.     The appropriate level of ordinary skill in the art is a complex factual inquiry within an abstract legal standard.  Defendants' anticipation, obviousness, and enablement invalidity defenses at bar are all based upon what a hypothetical person of ordinary skill in the art, with an understanding and command of the subject matter set forth in the prior art, would consider to be anticipatory, obvious or enabled under the patent laws.  "These issues are analyzed in great part from the perspective of a person of ordinary skill in the art, and testimony explaining the technical evidence from that perspective may be of great utility to the factfinder." Sundance, Inc. v. DeMonte Fabricating, Ltd., Nos. 2008-1068, 2008-1115, 2008 WL 5351734, at * 4 (December 24, 2008).

                An Issued Patent is Presumed Valid

65.     An issued patent enjoys a strong presumption of validity as provided by 35 U.S.C. §282, which can only be overcome by clear and convincing evidence that the patent is invalid. As the Federal Circuit stated in Minnesota Mining and Manufacturing Co. v. Chemgue, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002), "[a]n issued patent is presumed valid and the burden is on the party challenging the validity of a patent to show that it is invalid by clear and convincing evidence." (emphasis added).  "The statutory presumption of validity provided in 35 U.S.C. § 282 places the burden of proof upon the party attacking the validity of the patent, and that burden of persuasion does not shift at any time to the patent owner.  It is constant and remains throughout the suit on the challenger." TP Laboratories, Inc. v. Professional Positioners, Inc., 724 F.2d 965, 971 (Fed. Cir. 1984).

66.     35 U.S.C. §102(b) provides, in pertinent part:

A person shall be entitled to patent unless-

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or …

35 U.S.C. §102(b).

102(b) Bar to Patentability

67.    The party asserting patent invalidity pursuant to the 102(b) on-sale provision bears the burden of proof and must prove by clear and convincing evidence that a definite sale or offer for sale occurred in the United States in violation of section 102(b).  UMC Electronics Co. v. U.S., 816 F.2d 647, 656 (Fed. Cir. 1987) (emphasis added).  "Whether a particular activity raises the on-sale bar is a question of law, based on underlying factual considerations."  Intel Corp. v. U.S. International Trade Commission, 946 F.2d 821, 829 (Fed. Cir. 1991).

68.    An on sale bar determination requires that in order for prior art to invalidate a claim the on sale device "anticipated the claimed invention or would have rendered the claimed invention obvious viewing the device as prior art. STX, LLC v. Brine, Inc., 211 F.3d 588, 590 (Fed. Cir. 2000).  "The first determination in the §102(b) analysis must be whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention." Id. (emphasis added).

69.    With regard to Defendants' counterclaim that the '780 Patent is invalid because of the alleged dissemination of the Wilner Form Letters prior to the critical date, the Court finds that Defendants have failed to sustain their burden of invalidity of the '780 Patent due to the alleged dissemination of the Wilner Form Letters prior to the critical date.

41

A41

70.    Next, during trial, Defendants' argued that Bennett's purchase of circuit boards of the circuitry claimed in the '780 Patent from Accutronics was a prohibitory "sale" that should invalidate Bennett's '780 patent as a matter of law. The '780 Patent claims a retractable trim tab system, not just a "stand alone circuit" as alleged by Defendants. As such, a circuit board is merely one component of the overall claimed invention. In order for there to be a barring "sale" pursuant to §102(b), the sale must be of the claimed invention as a whole.

71.    When the asserted basis of invalidity is a public use or on-sale bar, the court should determine "whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention." Scaltech, Inc. v. Retec/Tetra, L.L.C., 178 F.3d 1378, 1383 (Fed. Cir. 1999). Bennett ordered a circuit board component from Accutronics before the critical date. Defendants do not allege, and Bennett did not, purchase the assembled retractable trim tab system that is claimed in the '780 Patent.

72.    As a result, Defendants' arguments that the '780 Patent is invalid as being offered for sale, sold, or published before the section 102 critical date, are rejected.

Defendants' 35 USC 102 and 35 USC 103 Invalidity Defenses Based on Prior Art

73.    Likewise, Defendants arguments that multiple pieces of prior art render the '780 Patent under sections 102 and 103 also fail. As the facts above make clear, none of the prior art introduced by Defendants at trial, alone or in combination, disclose automatic trim tab systems that retract upon removal of power from an engine.

74.    A claim is anticipated, and thus invalid under 35 U.S.C. §102, if a single prior art reference describes, either expressly or inherently, every element of the claim. Verdegaal Bros. v. Union Oil Co. of California, 814 F.2d 628, 631 (Fed. Cir. 1987). Every prior art reference

42

A42

"must be considered together with the knowledge of one of ordinary skill in the pertinent art." In re Paulsen, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citations omitted).

75.    It must be shown by clear and convincing evidence that each and every element of a patent claim is disclosed, as arranged in the claim, by a single prior art reference. If even one element is lacking, then the claim is not anticipated. There must be no difference between the invention as claimed and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention. Zenith Electronics Corp. v. PDI Communications Systems, Inc., 522 F. 3d 1348, 1363-64 (Fed. Cir. 2008).

76.    This Court finds that the Newman Patent does not anticipate the '780 patent due to the fact that it is missing several elements claimed in the '780 Patent. Specifically, the Newman Patent does not disclose any trim tabs, which are described in the '780 patent, and does not have automatic retraction upon removal of power from the engine.

77.    In view of the foregoing, the Court finds that the Newman Patent does not anticipate any of the independent claims of the '780 Patent under 35 U.S.C. §102. It therefore follows that claims 2-8 are also not anticipated by the Newman Patent by reason of dependency from claim 1, which is itself novel and not anticipated for the reasons set forth above, as well as the additional novel limitations set forth therein.

        No Anticipation by the Takeuchi I Patent or the Takeuchi II Patents

78.    The Takeuchi Patents [D.T.E. 140 and 143] describe a different type of trim tab actuator for a marine propulsion device, than the horizontal trim tabs at issue in this case. The vertical stabilizer-type trim tabs referenced in the '079 patent are attached to the outboard engine and programmed so as to maintain the watercraft in its present course as dictated by the measured

43

preset condition.  The vertical trim tab actuator described in the Takeuchi Patents has to do with the steering of the boat and not the roll, pitch or attitude.  Urban, Tr. (1/28) 608:1-609:3.

79.     Further, neither of the Takeuchi Patents disclose automatic retraction upon a removal of power from the engine.   Urban, Tr. (1/28), at 609:13-22.

80.     In view of the above, this Court finds that Defendants' have not proven invalidity by clear and convincing evidence.

        Obviousness Analysis

81.     A claimed invention is unpatentable due to obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). A patent is presumed valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity. 35 U.S.C. § 282 (1994).

82.     In the landmark KSR International v. Teleflex case, the Supreme Court reassessed the traditional teaching, suggestion, motivation (TSM) test for obviousness.  127 S. Ct. 1727 (2007). In order to determine obviousness as a legal matter, four factual inquiries must be made concerning: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) secondary considerations of nonobviousness, which in case law is often said to include commercial success, long-felt but unresolved need, failure of others, licensing, copying, and unexpected results. Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966); Miles Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 877 (Fed.Cir.1993). The ultimate determination is made in the context of the Graham factors, with the challenger having the ultimate burden of proving invalidity by clear and convincing evidence.

44

A44

See Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1360 (Fed. Cir.2007)

83.     Defendants contend that the '857 patent to Newman with U.S. Patent Nos. USPN

3,468,278 (the '278 patent); USPN 3,589,323 (the '323 patent);USPN 3,628,487 (the '487 patent);

USPN 3,695,204 (the '204 patent); USPN 4,310,320 (the '320 patent); USPN 4,420,741 (the '741

patent); USPN 4,742,794 (the '794 patent); USPN 4,742,794 (the '079 patent); USPN 5,097,188

(the '188 patent); or USPN 4,803, 493 (the '493 patent), either alone or in combination, render the

claims of the '780 patent obvious.  McAlexander, Tr. (2/5), at 1725:7-16.

84.     As set forth in the specification of the '780 Patent, the innovative aspect of the '780

Patent, is that it teaches and claims a trim tab system that retracts automatically upon removal of

power to the boat engine.  While electrical, hydraulic, and pneumatic trim tab systems were all

well-known throughout the marine industry at the time the '780 patent was filed, none of the

systems disclosed in these prior art references provided a means for automatic trim tab retraction

upon removal of power from the engine of the boat.  P.T.E. 1.

85.     Examination of the alleged prior art patents introduced by Defendants at trial reveals that

features of the '780 Patent's claims are neither disclosed nor suggested by any of these prior art

references, either alone or in combination.

86.     For instance, none of the prior art references, either alone or in combination, teach or

disclose a system that causes trim tabs to automatically retract upon removal of power to a boat

engine, including the Newman Patent, as discussed above.  Additionally, all of the

aforementioned "Trim Tab" patents do not in any way disclose or suggest means responsive to

removal of electrical power from the engine for performing any function.  Nor do they disclose or

suggest that a trim tab could or should be automatically moved to a retracted position upon

45

removal of electrical power from the engine, let alone structure for performing this function.

Enablement

87.    A patent may be found to be invalid if it does not provide an enabling disclosure of the invention, as required by 35 U.S.C. §112 1.  A decision on the issue of enablement requires determination of whether a person skilled in the pertinent art, (that of boat trim tabs) using the knowledge available to such a person and the disclosure in the patent document, could make and use the invention without undue experimentation.  Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 941 (Fed. Cir.1990).

88.    The party alleging invalidity for lack of enablement bears the burden of proving by clear and convincing evidence that the specification of a challenged patent fails to teach one of ordinary skill in the art how to make the invention. See Union Carbide Chem. & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1186 (Fed. Cir.2002); Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1378 (Fed. Cir.1999).

89.    Enablement is determined from the viewpoint of persons of skill in the art in the field of the invention at the time the patent application was filed.  Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1254 (Fed. Cir.2004).   Accordingly, if all of the methods or elements needed to practice the invention are either disclosed in the patent specification or were well known to those skilled in the art at the time the patent application was filed, the invention is properly enabled. Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc., 166 F.3d 1190, 1196 (Fed. Cir.1999).

90.    This Court concludes that the '780 patent specification provides more than enough information to enable someone of ordinary skill in the art to make and use the invention without

46

A46

undue experimentation.

91.    As stated above, electrical and pneumatic actuators were disclosed as alternative

embodiments to the hydraulic actuators detailed in the preferred embodiment of the '780 patent.

Further, electrical actuators were well-known in the art at the time the '780 patent was filed.  The

'780 patent does not claim a new kind of electric trim tab actuator because such trim tabs were

already well-known.  A patent need not teach, and preferably omits, that which is well known in

the art. In re Wands, 858 F.2d 731, 737 (Fed.Cir.1988).

92.    Accordingly, the Court finds the '780 patent properly enables an electrical actuator

application of the invention pursuant to 35 U.S.C. §112 1.

93.    Defendants have failed to overcome the presumption of validity of the '780 Patent by

clear and convincing evidence.

### 5. Inducement to Infringe

94.    As set forth above, the Court finds that Rinker's past and present installation of the Lenco

ATR constitutes a direct infringement of the '780 Patent.  The Court now turns to the issue of

whether Lenco, DeVito and/or Slocum induced Rinker's infringement of the '780 Patent.

95.    A person "induces" infringement under section 271(b) by "actively and knowingly aiding

and abetting another's direct infringement." C.R. Bard v. Advanced Cardiovascular Systems,

Inc., 911 F.2d 670, 675 (Fed. Cir. 1990).  The facts supporting inducement liability may include

participating in the infringing act, approving the infringing activity, or ratifying the infringing

activity. Power Lift, Inc. v. Lang Tools, Inc., 774 F.2d 478, 481 (Fed. Cir. 1985).

96.    "In order to induce infringement, there must first be direct infringement and proof that the

defendant knowingly induced infringement with the intent to encourage the infringement." DSU

47

A47

Medical Corp. v. JMS Co., Ltd., 471 F.3d 1293, 1305 (Fed. Cir. 2006).  In other words, "[a]

patent holder must prove that once the defendants knew of the patent, they 'actively and

knowingly aid[ed] and abet[ed] another's direct infringement.'"  Id. (quoting Water Technologies

Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir. 1988)).  "Direct evidence is not required" to

prove such intent; "rather, circumstantial evidence may suffice."  DSU Medical Corp., 471 F.3d

at 1305.

97.     In DSU, the Federal Circuit noted that the intent factor may be established wherein an

alleged infringer "knew or should have known his actions would induce actual infringement, and

is shown to have induced infringing acts through his actions."  That is, the "affirmative intent to

cause direct infringement", required by DSU may be shown by establishing first that the

defendant "intended to cause the acts that constitute the direct infringement" and second, that the

defendant "kn[ew] or should have known [that] its action would cause the direct infringement."

Broadcom Corporation v. Qualcomm Incorporated, 543 F.3d 683 (Fed. Cir. 2008) (citing DSU,

471 F.3d at 1305).  Intent is a factual determination particularly within the province of the trier of

fact and may be inferred from all of the circumstances.  Water Technologies Corp., 850 F.2d at

669.

98.     As set forth below, the evidence shows that both DeVito and Lenco knowingly and with

intention caused Rinker to continue to install Lenco's ATR in an infringing manner, and knew

that such steps would result in Rinker's continued infringement.   Indeed, DeVito's deliberate

actions resulted in all Rinker boats having installed the Lenco ATR in an infringing manner.  The

Court, however, also finds that Bennett has failed to carry its burden of proof as to Slocum.  The

Court finds that Slocum did not induce the infringement perpetrated by Rinker.

48

<u>Lenco and DeVito Intended to Cause Acts of Direct Infringement of the '780 Patent</u>

99.    DeVito took affirmative steps to ensure that Lenco customers continued their

infringement of the '780 Patent by entering into indemnification agreements with Lenco

customers such as Rinker and C&C Manufacturing.    <u>Hewlett-Packard v. Bausch & Lomb, Inc.</u>

909 F.2d 1464, 1470 (Fed. Cir. 1990) (An indemnification agreement "will generally not

establish an intent to induce infringement, but such intent can be inferred when the primary

purpose is to overcome the deterrent effect that the patent laws have on would-be infringers.");

<u>see also</u> <u>E.I. Dupont De Nemours and Company v. Monsanto</u>, 903 F. Supp. 680, 739 (D. Del.

1995); <u>Power Integrations, Inc. v. Fairchild Semiconductor Intl.</u>, 589 F. Supp.2d 505, 511 (D.

Del. 2008).  In DeVito's own words, he offered indemnification to Rinker because he "did not

want to lose the business".

100.    As set forth above, DeVito and Lenco assured customers, including Proline, C&C, Tige,

and Rinker that there was nothing to worry about and to keep building boats, when they received

letters from Bennett regarding their infringement of the '780 Patent.  Slocum, Tr. (1/28), at

725:9-15; Kleeman, Tr. (2/4), at 1573:21-1574:2; 1592:16-1593:17; Designated Campbell Depo.,

at 57, 59-60, 113-114; Designated Burnett Depo., at 30-31; Designated Austin Depo., at 30.

101.    Dean Burnett of C&C testified that when he discussed with DeVito the cease and desist

letter dated July 19, 2004 that C&C had received from Bennett, that at no time did DeVito

mention the parties' Settlement Agreement, or the fact that installation of the ATR device to the

ignition switch was an infringement of the '780 Patent.  Designated Burnett Depo., at 30 -31.

102.    Similarly, Mr. Campbell of Proline Boats testified that when he discussed with DeVito a

phone call he received from Tom McGow regarding a dispute between Lenco and Bennett, that

DeVito told him "there's something ongoing, just keep on doing business, and not to worry about it at the time." Designated Campbell Depo., at 60. Later on, Proline received a letter from Bennett dated March 16, 2005, informing Proline of the Settlement Agreement and '780 Patent. Mr. Campbell testified that when he told DeVito about the letter, that DeVito responded: "it was over with". Designated Campbell Depo., at 93. At no time did DeVito advise Proline of the Settlement Agreement between Lenco and Bennett, and the fact that installation of Lenco's ATR to the key switch was a violation of the '780 Patent.

103.    DeVito and Lenco honored all his warranties to the customers without asking how the Lenco ATRs were wired. Designated (3/30/05) Devito Depo., at 201. Indeed, there is no evidence that Lenco ever denied a warranty claim on its ATR systems wired to the ignition switch, such that the trim tabs automatically rose upon removal of power from the engine.

104.    The Court finds that DeVito's acts, individually and on behalf of Lenco, induced Rinker's direct infringement of the '780 Patent.

Lenco and DeVito Knew or Should Have Known That There Acts Would Induce Direct Infringement

105.    In Broadcom, the Federal Circuit held that opinion of counsel evidence, along with other factors may reflect whether the accused infringer "knew or should have known" that its actions would cause another to directly infringe. 543 F.3d at 698. Accordingly, such evidence is relevant to the intent analysis under DSU. Id.

106.    DeVito testified that he "analyzed" Bennett's ATR when designing the Lenco ATR. However, he also admitted that this analysis did not include an inspection of Bennett's ATR as neither he nor Martin purchased a Bennett ATR.

50

A50

107.    While DeVito testified that he conferred with counsel regarding his design of Lenco's ATR, he testified that he did not receive a written opinion of counsel.

108.    In fact, Mr. Martin testified that DeVito asked him to review the '780 Patent as early as 2000, and that pursuant to his review, Mr. Martin had concerns about whether the Lenco ATR System he developed would fall within the scope of the claims of the '780 Patent.  Martin, Tr. (2/4), at 1470:13-1471:22; 1474:11-21.

109.    Mr. Martin recommended that DeVito consult a patent attorney to get an opinion regarding infringement, but Mr. Martin has never seen such an opinion.  Martin, Tr. (2/4), at 1476:21 -1477:15.

110.    Based on the above evidence this Court finds that the second prong under DSU is satisfied with respect to Lenco and DeVito.  Accordingly, the Court finds that Lenco and DeVito induced direct infringement of the '780 Patent.

            6. Willful Infringement

111.    In In re Seagate, 497 F.3d 1360 (Fed. Cir.2007) (en banc), the court set forth the standard of willfulness.

112.    Under the new Seagate standard for willfulness, "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." 497 F.3d at 1371. "[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." Id. "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the

51

A51

accused infringer." Id.  The Seagate decision also clarified that there is "no affirmative obligation to obtain opinion of counsel" in order to avoid liability for willful infringement. Id.

113.    In making the determination as to willfulness, the Court must consider the totality of the circumstances.  The totality of the circumstances comprises a number of factors, which include, but are not limited to whether Defendants intentionally copied the claimed invention, whether Defendants relied on competent legal advice, and whether the Defendants presented a substantial defense to infringement, including the defense that the patent is invalid.

114.    Since Lenco and DeVito have relied not on a legal opinion in defense to Bennett's allegation of willful infringement, the Court will not include this factor in its analysis of the totality of the circumstances.

115.    The Court finds that Lenco and DeVito willfully infringed the '780 Patent because they received repeated actual notice of the '780 Patent, and continue their infringing acts in complete disregard for Plaintiff's rights.

### 7.  Bennett Is Not Barred From Bringing Patent Infringement Claims Against Lenco

116.    Lenco asserts that pursuant to paragraph 13 of the Settlement Agreement, Bennett agreed not to bring or threaten to bring an action for infringement of the '780 Patent against Lenco provided that Lenco satisfied its obligation under the Settlement Agreement and that  having satisfied its obligations, Bennett is contractually barred from bringing patent infringement claims against Lenco.

117.    Lenco breached its obligations under the Settlement Agreement by manufacturing and distributing an infringing product which retracts trim tabs upon removal of electrical power from the engine, namely, the product designed to be wired to the tachometer gauge of the boat.    Thus,

Lenco has counseled and advised its customers to use its retraction device in a manner other than shown in Appendix B of the Settlement Agreement.

118.    Florida law states that "[w]hen a contract is breached by one of the parties, the other party is released from any obligations to perform under the contract." Miller v. Reinhart, 548 So.2d 1174, 1175 (Fla. Dist. Ct. App. 1989)).

119.    Lenco failed to satisfy its obligations under the terms of the Settlement Agreement, thereby releasing and excusing Bennett from its obligations under paragraphs 12 and 13 of the Settlement Agreement.

120.    Furthermore, Bennett is entitled to bring this action against Lenco for inducement to infringement the '780 Patent.

    8. Patent Damages

121.    Recovery of damages for patent infringement is governed by 35 U.S.C. §284, which provides for the patentee to recover the infringer's profits, its lost profits, or no less than a reasonable royalty.  As previously indicated, the Court finds that the appropriate measure of damages in this case is a reasonable royalty.  The Court rejects lost profits as the measure of damages because the Court finds that Lenco's customers used Lenco's product primarily for reasons other than the retraction feature.

122.    Based upon the reasonable royalty of $3.00 per unit, Bennett is entitled to recover $105,813.00 in damages from Lenco and DeVito.  Because the Court has found that Defendants engaged in willful conduct, the Court, in the exercise of its discretion, will double the damage award to $211,626.  Transclean Corp. v. Bridgewood Services, Inc., 290 F.3d 1364, 1377-78 (Fed. Cir. 2002).  Prejudgment interest shall be applied to this award measured from the date of

trial to the date of judgment at the Florida statutory rate.[4]  The prejudgment interest is $37,232.00, making a total damage award against Lenco and DeVito of $248,858.00, jointly and severally.

123.    Based upon the reasonable royalty of $3.00 per unit, Bennett is entitled to recover $23,538.00 in damages from Rinker.  Prejudgment interest shall be applied to this award measured from the date of trial to the date of judgment at the Florida statutory rate.  The prejudgment interest is $4,142.00, making a total damage award against Rinker of $27,680.00.

        9. Permanent Injunction

124.    In eBay Inc. v. MercExchange, L.L.C., the Supreme Court held that a plaintiff seeking a permanent injunction in a patent case must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. 547 U.S. 388, 391 (2006).

        No Irreparable Harm And Monetary Damages are Adequate

125.    Irreparable harm is "'often suffered when the injury can[not] be adequately atoned for in money ... or when the district court cannot remedy [the injury] following a final determination on the merits,' " as when the plaintiff loses market share or its reputation for innovation. Wald et al. v. Mudhopper Oilfield Svcs., Inc. et al., 2006 WL 2128851, at * 5, 2006 U.S. Dist. LEXIS 51669, at * 16 (W.D. Okla. July 27, 2006) (quoting Prairie Band of Potawatomi Indians v.

---

[4]  The Court shall apply the state statutory rate of interest for the years 2009(8%), 2010(6%) and 2011(6%).

Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001)). Although stated as two separate factors under eBay, the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff.   Canadian Lumber Trade Alliance v. U.S., 441 F. Supp .2d 1259, 1264 (C.I.T. 2006). Under the principles of equity to which the Court referred throughout its opinion in eBay, irreparable harm means "'that unless an injunction is granted, the plaintiff will suffer harm which cannot be repaired.'"  Id. (quoting Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir.1966)).

126.     Although Plaintiff has proven infringement, there is no irreparable harm.  The Court finds that the sales lost by Plaintiff were due to the purchasers of Lenco's product being a superior product, not because of the automatic retraction.  Money damages will adequately compensate Bennett for any harm suffered as a result of Defendants' actions.

Balancing of Hardships

127.     The Court finds that in balancing the hardships, the balance weighs against the issuance of an injunction. Lenco's customers purchased its product primarily for reasons other than the inclusion of Bennett's invention. Lenco should not be enjoined from continuing to market its product which has gained acceptance in the marketplace for reasons other than the use of Bennett's invention, when monetary damages will adequately compensate Bennett.

Public Interest

128.      For the reasons already discussed, the public interest would not be served by issuing an injunction in this case.

129.     After considering the traditional equitable factors, the court concludes that a permanent injunction should not be entered in this case.

B.    Breach of Contract

130.    Contract interpretation is governed by state law. Panduit Co. v. Hellermanntyton Co., 451 F.3d 819 (Fed. Cir. 2006) (citing Unova, Inc. v. Acer, Inc., 363 F.3d 1278, 1280 (Fed. Cir. 2004)). In this case, the Settlement Agreement expressly provides that it is to be interpreted in accordance with the laws of the State of Florida. P.T.E. 15.

131.    To prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a contract; (2) a breach thereof; and (3) damages suffered as a result. Miller v. Nifakos, 655 So.2d 192, 193 (Fla. Dist. Ct. App. 1995); Collections, USA, Inc. v. City of Homestead, 816 So.2d 1225, 1226 n.2 (Fla. Dist. Ct. App. 2002).

   1. Lenco Materially Breached the Settlement Agreement

132.    The language of the Settlement Agreement is unambiguous and expressly concerns a specific product that infringes on the '780 Patent, Lenco's trim tab retractor, the Lenco ATR.

133.    The Lenco ATR infringes on the '780 Patent.

134.    Lenco materially breached the Settlement Agreement by inducing developing and selling an infringing product which was designed to be wired into the tachometer gauge of the boat. This product was designed by Lenco in order to attempt to avoid the '780 patent and to avoid its obligations under the Settlement Agreement.  Lenco also breached the Settlement Agreement by inducing Rinker and others to infringe the '780 patent.

   2. Damages

135.    The Court finds that the damages for patent infringement previously awarded by this order are the same damages suffered by Bennett for Lenco's breach of the contract.

56

A56

C.    Other Claims

136.    The Court finds that Bennett has not proven the claims of common law Unfair

Competition, Fraud, Fraudulent Misrepresentation and a violation of the Florida Deceptive and

Unfair Trade Practices Act.  In any event, to the extent, Lenco, DeVito and Rinker's acts could

be considered to have been satisfied the elements of these causes of action, the Court finds that

Bennett's damages, if any, for these claims would be the same damages it suffered from the

patent infringement and breach of contract.

III.  CONCLUSION

Judgment shall be entered  in favor of Plaintiff, Bennett Marine, Inc., and against

Defendants Lenco Marine, Inc., Rinker Boat Company, LLC, Richard DeVito, Jr. consistent with

this order.    Bennett shall recover nothing against Kim Slocum.  Defendant Lenco Marine, Inc.

and Rinker Boat Company, LLC shall recover nothing on their counterclaims, and judgment shall

be entered in favor of Plaintiff/Counter-Defendant Bennett Marine, Inc. and against

Defendant/Counter-Plaintiff Lenco Marine, Inc. and Rinker Boat Company, LLC.   The court

hereby finds and declares that:

(a)    Rinker Boat Company is liable for direct infringement of United States Patent No.

5,113,780;

(b)    Lenco Marine, Inc. and Richard DeVito are liable for inducement to infringe of United

States Patent No. 5,113,780;

(c)    Lenco Marine, Inc. has breached the February 25, 2003 Settlement Agreement between

the parties;

(d)    Bennett is entitled to recover damages as set forth in this order.

57

A57

(e)    Bennett shall recover nothing against Kim Slocum.

Done and Ordered in Chambers, in West Palm Beach, Florida, this 29th day of September,

2011.

KENNETH A. MARRA
UNITED STATES DISTRICT JUDGE

58

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60326-CIV-MARRA/JOHNSON

BENNETT MARINE, INC.,
a Florida corporation,

Plaintiff,

vs.

LENCO MARINE, INC.,
a Florida corporation, RINKER
BOAT COMPANY, a Delaware
limited liability company, RICHARD
DEVITO, JR., an individual and KIM
SLOCUM, an individual

Defendants.
_____/

## SECOND AMENDED FINAL JUDGMENT

Based upon the Findings of Fact and Conclusions of Law entered on September 29, 2011

and the Order granting the motion to amend the Findings of Fact and Conclusions of Law entered

on this date, Judgment is hereby entered as follows:

BENNETT MARINE, INC. shall recover from LENCO MARINE, INC. and RICHARD

DeVito, JR., the sum of $339,054.00, jointly and severally, which judgment shall bear interest at

the rate of .10% from this date until it is satisfied.

BENNETT MARINE, INC. shall recover from RINKER BOAT COMPANY, LLC, the

sum of $27,680.00, which judgment shall bear interest at the rate of .10% from this date until it is

satisfied.

BENNETT MARINE, INC. shall recover nothing against KIM SLOCUM.

A59

LENCO MARINE, INC. and RINKER BOAT COMPANY, LLC shall take nothing on

their counterclaims against BENNETT MARINE, INC.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 2nd  day of March, 2012.

_____

KENNETH A. MARRA
United States District Judge



US005113780A

# United States Patent [19]

Bennett et al.

[11] Patent Number: 5,113,780

[45] Date of Patent: May 19, 1992

[54] **AUTOMATIC BOAT TRIM TAB CONTROL**

[75] Inventors: **Blake J. Bennett,** Boca Raton, Fla.;
**David A. Hagstrom,** Endicott, N.Y.

[73] Assignee: **Bennett Marine, Incorporated,**
Deerfield Beach, Fla.

[21] Appl. No.: **575,193**

[22] Filed: **Aug. 30, 1990**

[51] Int. Cl.⁵ .............................................. B63B 39/06
[52] U.S. Cl. ................................................. 114/286
[58] Field of Search ............... 114/285, 286, 126, 287,
114/275, 276, 291, 277, 284

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,641,965 | 2/1972 | Schmiedel | 114/286 |
| 3,695,204 | 10/1972 | Bennett | 114/286 |
| 4,261,278 | 4/1981 | Gaudin | 114/286 |
| 4,762,079 | 8/1988 | Takeuchi et al. | 114/285 |

*Primary Examiner*—Jesús D. Sotelo
*Assistant Examiner*—Stephen P. Avila

*Attorney, Agent, or Firm*—Barnes, Kisselle, Raisch, Choate, Whittemore & Hulbert

[57] **ABSTRACT**

A boat trim control system that includes a pair of trim tabs pivotally mounted to the stern of a boat hull, and an engine responsive to application of electrical ignition power for powering the boat through the water. A pair of fluid actuators extend between the hull and the respective trim tabs for selectively and adjustably moving the tabs between fully extended and fully retracted positions. A fluid drive is responsive to a boat operator for selectively adjusting positions of the trim tabs independently of each other to maintain a desired attitude of the boat hull. Electronic control circuitry is responsive to removal of ignition power from the engine for operating the fluid drive and energizing the actuators for a predetermined time duration so as to move boat trim tabs to the fully retracted positions upon removal of ignition power from the engine.

**9 Claims, 1 Drawing Sheet**





FIG.1

FIG.2

5,113,780

1                                                                          2

AUTOMATIC BOAT TRIM TAB CONTROL

The present invention is directed to control of trim tabs on power boats, and more particularly to automatic positioning of the trim tabs at a fully retracted position upon removal of ignition power from the boat engine.

BACKGROUND AND OBJECTS OF THE INVENTION

Devices are conventionally employed on power boats for selectively adjusting or trimming boat attitude under varying load and sea conditions as the boat is powered through the water. For example, U.S. Pat. No. 3,695,204 discloses a trim control system in which a pair of trim tabs are pivotally mounted at laterally spaced positions on the boat stern. A pair of hydraulic fluid actuators extend between the boat hull and the respective trim tabs, and are connected to a valve and pump system coupled to an operator control for selectively adjusting positions of the respective trim tabs independently of each other. Other attitude trim control devices are known in the art.

Although the trim control system disclosed in the above-noted patent has enjoyed substantial commercial acceptance and success, improvements remain desirable. For example, when the engine is shut down, the trim tabs remain in the positions last selected by the operator. When the engine is restarted for powering the boat, the operator may not be aware of the positions of the trim tabs. Further, if the trim tabs and actuators remain extended, hydraulic pressure is maintained in the trim tab actuators during non-use, and unnecessary marine growth may occur on the actuating cylinders. There is also a risk of damage to the trim tabs from fork lifts, trailers and dry storage racks.

A general object of the present invention, therefore, is to provide a trim tab control system that includes facility for automatically returning the trim tabs to the fully retracted positions when engine operation is terminated. Another and more specific object of the present invention is to provide a trim tab control system of the described character that can be installed in the aftermarket on existing power boats by relatively unskilled personnel.

SUMMARY OF THE INVENTION

A power boat trim control system in accordance with the present invention includes a boat having a hull and an engine for powering the boat through the water. At least one device such as a trim tab is movably mounted to the hull for trimming attitude of the boat as the hull is propelled through the water. The trim tab is selectively adjustable by an operator to maintain desired boat attitude under varying load and sea conditions. Electronic control circuitry is coupled to the trim tab and to the engine for automatically moving the trim tab to a predetermined position—e.g., a fully retracted position—upon removal of power from the engine.

In the preferred embodiment of the invention, the trim control mechanism comprises a pair of trim tabs pivotally mounted to the hull at laterally spaced positions on the stern. A pair of fluid actuators extend between the hull and the respective trim tabs for selectively moving each tab to any desired position between a fully extended and a fully retracted position. A fluid drive is responsive to the boat operator for selectively adjusting positions of the trim tabs independently of

each other to maintain a desired attitude of the boat hull. The electronic control circuit is coupled to the fluid drive and is responsive to removal of electrical ignition power from the engine for operating both actuators simultaneously for a predetermined time duration so as to move both trim tabs to the fully retracted positions upon removal of ignition power from the engine.

The boat trim tabs are thus returned to the fully retracted positions each time power is removed from the engine. In this way, the boat operator will be aware of initial trim tab position each time power is applied to the engine even when the boat is not equipped trim tab position indicating devices. With the trim tabs and actuators fully retracted, the actuators are not subjected to hydraulic fluid pressure during storage, and marine growth on the actuators is reduced. Also reduced is the likelihood of damage to one or both of the trim tabs during storage and/or transport of the boat.

BRIEF DESCRIPTION OF THE DRAWING

The invention, together with additional objects, features and advantages thereof, will be best understood from the following description, the appended claims and the accompanying drawing in which:

FIG. 1 is a functional block diagram of a power boat trim control system in accordance with a presently preferred embodiment of the invention; and

FIG. 2 is an electrical schematic diagram of the automatic tab retraction module in the functional block diagram of FIG. 1.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENT

FIG. 1 illustrates a power boat trim control system 10 in accordance with a presently preferred embodiment of the invention as comprising a pair of trim tabs 12,14 pivotally mounted by respective hinges 16,18 on the stern 20 of a boat hull 22. A pair of hydraulic actuators 24,26 are respectively mounted on stern 20 and have actuator rods that extend to trim tabs 12,14. A fluid pump 28 is powered by an electrical motor 30 for supplying hydraulic fluid under pressure from a fluid source to actuators 24,26 through respective solenoid-operated flow control valves 32,34. An ignition key switch 36 selectively connects the ignition control system 37 of the boat engine to a source of electrical power, such as a battery 38. An operator switch 40 is coupled to battery 38 for selectively applying electrical control signals to motor 30 and valves 32,34 for adjusting position of trim tabs 12,14 independently of each other. To the extent thus far described, system 10 is of conventional construction, with the electrohydraulic trim tab control being disclosed in detail in above-noted U.S. Pat. No. 3,695,204.

In accordance with the present invention, an electronic control circuit 42 (FIGS. 1 and 2) is connected to motor 30 and valves 32,34 for automatically retracting actuators 24,26 and tabs 12,14 upon removal of ignition power from engine ignition control 37. More specifically, the power input to engine ignition control 37, on the normally open side of switch 36, is connected within automatic tab retractor circuit 42 through a diode 44 and a resistor 46 across an energy storage capacitor 48. A zener diode 50 is connected across capacitor 48 for limiting the voltage stored thereon. Capacitor 48 is connected through a resistor 52 to the input of an amplifier 54. The normally open contact of switch 36 is also connected through a diode 56 and a voltage divider

3

58,60 to the input of a second amplifier 62. Amplifiers 54 and 62 may be Darlington switches.

The output of amplifier 54 is connected through the coils 64,66 of a pair of electronic relays 68,70 to battery 38 at the common contact of switch 36 (FIG. 1), so that power is applied to relays 68,70 independently of switch 36. A diode 72 is connected across coils 64,66 for limiting voltage spikes. Relay 68 has a normally open contact set 74 responsive to current through coil 64 for connecting motor 30 to power source 38 independently of switch 40. Likewise, relay 70 has a pair of normally open contact sets 76,78 responsive to current through coil 66 for connecting solenoid valves 32,34 to battery 38 independently of switch 40.

In operation, with ignition switch 36 closed and ignition power thus applied to control circuit 37, power is likewise supplied to automatic tab retractor circuit 42, so that the input to amplifier 62 is high and voltage is stored at substantially battery potential on capacitor 48. The output of amplifier 62 is at a low voltage state, so as to inhibit operation of amplifier 54 independently of potential across capacitor 48. The output of amplifier 54 is therefore at a high voltage level, and no current is conducted through relay coils 64,66. Operation of motor 30 and valves 32,34 is thus controlled by switch 40 during normal boat operation.

When ignition switch 36 is opened so as to remove power from control circuit 37, the input to amplifier 62 switches to a low voltage potential, and the output thereof switches to a high or open circuit condition. Amplifier 62 thus no longer inhibits operation of amplifier 54. Capacitor 48 therefore raises the input of amplifier 54 to a high voltage state, and discharges through resistor 52 into the input of amplifier 54 for a predetermined time duration corresponding to the values of capacitor 48 and resistor 52. During this capacitor discharge time, the output of amplifier 54 assumes a low voltage state and draws current through coils 64,66 of relays 68,70, closing relay contact sets 74,76 and 78, and applying power through the relay contacts to pump motor 30 and valves 32,34. The time duration of discharge of capacitor 48 through resistor 52 and amplifier 54 is selected to be sufficient to return both trim tabs 12,14 simultaneously to the fully retracted positions independently of the positions at which the trim tab had been set during normal operation.

Thus, upon opening of switch 36, both trim tabs 12,14 and actuators 24,26 are moved to the fully retracted positions. When power is again applied to the ignition control circuitry, the trim tab positions may again be selectively adjusted by the operator through switch 40. It will be appreciated, of course, that the principles of the invention apply to electrical or pneumatic actuators of trim tabs, in addition to the preferred hydraulic implementation. The invention may be employed in conjunction with any number of trim tabs on a given boat. The predetermined actuation time of amplifier 62, determined by capacitor 48 and resistor 52, varies with the number of trim tabs and cylinders. For example, a fifteen second duration would be appropriate for two tabs and one actuator per tab, whereas a duration of twenty-two to twenty-five seconds would be appropriate for a boat having two tabs and two actuators per tab.

We claim:

1. A boat trim control system that comprises:
   a boat having a hull and an engine for powering said boat,

4

   means for selectively applying electrical power to said engine for powering the boat,
   means movably mounted to said hull for trimming attitude of said boat as said hull is propelled through the water,
   means carried by said hull and responsive to a boat operator for selectively adjusting position of said trimming means to maintain desired attitude under varying conditions, and
   means coupled to said trimming means and to said engine, and responsive to removal of electrical power from said engine, for automatically moving said trimming means to a predetermined position with respect to said hull upon removal of power at said engine.

2. The system set forth in claim 1 wherein said means response to removal of electrical power comprises means for sensing removal of electrical ignition energy from said engine to move said trimming means to said predetermined position.

3. The system set forth in claim 1 wherein said selectively-positioning means comprises actuator means extending between said hull and said trimming means for moving said trimming means toward and away from said predetermined position, and wherein said automatically-moving means comprises means for applying power to said actuator means for a predetermined time duration following removal of power at said engine sufficient to move said trimming means to said predetermined position independently of position of said trimming means when power is removed from said engine.

4. The system set forth in claim 3 wherein said actuator means comprises a fluid actuator, said selectively-positioning means comprising a pump and a valve for selectively applying fluid under pressure to extend and retract said actuator, said automatically-positioning means comprising means for operating said pump and valve so as to move said actuator and trimming means to a fully retracted position.

5. The system set forth in claim 4 wherein said attitude-trimming means comprises a pair of laterally spaced trim tabs pivotally mounted to said hull, said selectively-positioning means comprising a pair of said actuators respectively coupled to said trim tabs, a pump and a pair of said valves for selectively extending and retracting said actuators independently of each other, and wherein said automatically-positioning means comprises means for operating said motor and valves simultaneously to move said actuators and trim tabs to said fully retracted position.

6. The system set forth in claim 3 wherein said means responsive to removal of electrical power comprises means for sensing removal of electrical ignition energy from said engine to move said trimming means to said predetermined position.

7. The system set forth in claim 6 wherein said automatically-moving means comprises an electronic switch connected between said source of electrical power and said actuator means, and means for closing said switch for said predetermined time duration upon removal of ignition power from said engine.

8. The system set forth in claim 7 wherein said switch-closing means comprises electrical energy storage means, means for storing electrical energy on said storage means as long as ignition power is supplied to said engine, and means for discharging said energy storage means over said predetermined time duration upon removal of ignition energy from said engine.

5,113,780

| 5 | 6 |

9. A boat trim control system that comprises:

a boat having a hull with a stern and an engine,

at least one trim tab pivotally mounted to said hull at said stern,

an actuator extending between said hull and said tab for selectively moving said tab between fully extended and retracted positions,

means including a drive responsive to an operator for selectively adjusting position of said trim tab to obtain a desired attitude of said hull,

means for selectively applying electrical ignition power to said engine for powering said boat, and

means coupled to said drive and responsive to removal of electrical power from said engine for operating said actuator for a predetermined time duration so as to move said trim tab to said fully retracted position upon removal of ignition power from said engine.

*    *    *    *    *

# United States Court of Appeals
## for the Federal Circuit

BENNETT MARINE, INC. v. LENCO MARINE, INC., 2012-1336, -1354

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by SHUTTS & BOWEN, LLP, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **September 17, 2012**, Counsel for Appellants has authorized me to electronically file the foregoing **Appellant's Initial Brief** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

James A. Gale, Esq.,
Christina D. DeAngelis, Esq.
Feldman Gale, P.A.
One Biscayne Tower - 30th Floor
2 South Biscayne Boulevard
Miami, FL 33131
Phone: 305-358-5001
Fax: 305-358-3309
Email: jgale@feldmangale.com
Email: cdeangelis@ feldmangale.com

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

September 17, 2012                    /s/ Robyn Cocho
                                     Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X    The brief contains <u>13,992</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X    The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2007</u> in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using <u>MS Word 2007</u> in a ___ characters per inch_____ font.

<u>September 17, 2012_____</u>      <u>/s/ Eric C. Christu_____</u>
Date                                   Eric C. Christu
                                       Counsel for Appellant